176 So.2d 453 (1965)
Elizabeth Ann PETERSON et pere, Plaintiffs-Appellants-Appellees,
v.
Charles R. ARMSTRONG et al., Defendants-Appellees-Appellants.
No. 1419.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1965.
Rehearing Denied June 24, 1965.
Thomas & Friedman, by Gerard F. Thomas, Jr., Natchitoches, for plaintiffs-appellees.
Gist, Gist, Methvin & Trimble, by DeWitt T. Methvin, Jr., Alexandria, for defendants-appellants U. S. F. & G.
Mayer & Smith, by Alex F. Smith, Jr., Shreveport, for defendants-appellants Traders & General and Charles R. Armstrong.
Bodenheimer, Looney & Jones, by G. M. Bodenheimer, Jr., Shreveport, for defendant-appellee Central Mutual.
Blanchard, Walker, O'Quin & Roberts, by Wilton H. Williams, Jr., Shreveport, for defendant-appellee, Traders Indem. Co.
Before TATE, FRUGE, and SAVOY, JJ.
*454 TATE, Judge.
This suit results from a headon collision involving automobiles driven respectively by Charles Armstrong and by Sidney Lucius. To recover for the injuries thereby sustained, the plaintiff Miss Peterson, a passenger in the Lucius vehicle, sues (1) Armstrong, (2) certain liability insurers allegedly responsible for his negligence ("Traders and General", "Travelers", and "U.S.F. & G."); and (3) the liability insurer of Lucius's operation of his automobile ("Central"). Three other of Lucius's passengers filed similar suits, which were consolidated with the present for trial and appeal.
The trial court rendered judgment against all defendants, and all except Central on appeal deny liability. (Central deposited policy limits after adverse judgment and did not appeal). The four plaintiffs either appealed or answered the defendants' appeals to request an increase in the awards.
In the present opinion, we will discuss the issues common to all four consolidated appeals. Quantum will be discussed separately in each of the consolidated actions, our decisions in the companion suits being rendered this date: Goss v. Armstrong, 176 So.2d 462; Mogg v. Armstrong, 176 So.2d 463; Ponselle v. Armstrong, 176 So. 2d 464.
The trial court judgment.
The trial awards to the four plaintiffs totalled nearly twenty-six thousand dollars for their personal injuries. (No property damage is involved.) The trial court held solidarily liable for this amount both Armstrong and his insurers (U.S.F. & G., Traders, and Travelers) and Central as the insurer of Lucius (who himself was not impleaded), subject to policy limits of coverage of these insurers. All of the insurers had issued "5/10/5" coverage,[1] except Travelers, which had issued 10/20/5 coverage.
U.S.F. & G. was held liable as the primary insurer of the Armstrong-driven vehicle up to its policy limits of ten thousand dollars, while Central was likewise held liable up to its policy limits in the same amount as the primary insurer of the Lucius vehicle. As Armstrong's insurers, Travelers and Traders were held secondarily liable as excess insurers for the approximately six thousand dollars recovery in excess of these policy limits, with the excess liability being divided equally between these two excess insurers.
Issues.
There is no really substantial issue as to the concurring negligence of Armstrong and Lucius, the two drivers. Both vehicles collided headon at the crest of a hill. Each vehicle was in the middle of the gravel road, rather than on its proper side of it. Without detailed discussion, we will simply state that we find no error in the trial court's determination that the accident resulted from the concurring negligence of both drivers. See Cormier v. Traders & General Ins. Co., La.App. 3 Cir., 159 So.2d 746, certiorari denied as to liability (although granted as to quantum, see 245 La. 806, 161 So.2d 279; also, 246 La. 976, 169 So.2d 69); Duhon v. Harkins, La.App. 3 Cir., 152 So.2d 85.
Aside from quantum, the principal issues of these consolidated appeals are: (1) Is the defendant U.S.F. & G. liable as an omnibus insurer of the car driven by Armstrong? (2) If so, what is the proper method of apportioning between Traders and Travelers the damages for which they are liable as the excess insurers of the vehicle driven by Armstrong?
These issues involving these insurers arise in the following context:
The vehicle driven by Armstrong was owned by J. R. Bennett, the father of a college *455 friend. U.S.F. & G. had issued Bennett a liability policy insuring operation of the Bennett vehicle while being used with Bennett's consent. (A substantial issue of this appeal is whether Armstrong's use of the Bennett vehicle was covered under this "omnibus" coverage.)
Armstrong's negligent operation of any non-owned automobile (such as the Bennett vehicle) was also insured by his own family's insurance policies, issued respectively by Traders and by Travelers. In the event of such coverage under the "drive other car" clause, however, each of these Armstrong policies contained a provision that, if other (primary) insurance covered Armstrong's operation of the non-owned automobile, then that the Armstrong policies should be excess insurance (i. e., not available to pay the damages until exhaustion of primary insurance policy limits). If U.S.F. & G. is held under its omnibus clause to have afforded coverage to Armstrong while using the Bennett car insured by it, then Traders and Travelers are excess insurers, and the other substantial question of this appeal arises: Should the excess recovery be divided equally between these insurers, or should it instead be prorationed in proportion with the respective policy limits (in which case Travelers would pay twice as much of the excess as Traders, since its policy limits were twice those of Traders)?
1. Liability (coverage of U.S.F. & G. as omnibus insurer of Bennett Oldsmobile).
One of the two automobiles involved in the headon collision was a 1959 Oldsmobile owned by J. R. Bennett of Alexandria. It was driven at the time of the accident by the defendant Armstrong, who had been loaned the car by Bennett's son, Kent. U.S.F. & G. makes a strong contention that there was no coverage of the insured automobile in favor of the driver, Armstrong, because the insured's son Kent had been expressly forbidden to let anyone else drive his parents' car while it was entrusted to his use.
The liability policy insuring the Oldsmobile issued to Bennett by U.S.F. & G. provided that, with respect to such owned automobile, the coverage would include the named insured and any resident of his household, and also, as an omnibus insured, "any other person using such automobile, provided the actual use thereof is with the permission of the Named Insured." Under the policy definitions, the named insured was J. R. Bennett and his wife.
Under the current jurisprudence, only the named insured and his wife may constitute one a permittee and thus afford him coverage; if an original borrower turns over the possession of the vehicle to a second permittee, this second permittee is not considered as using the car with the permission of the named insured, unless, either expressly or by implication, the initial permission included the named insured's consent for the first permittee to allow third persons to use the insured vehicle. Rogillio v. Cazedessus, 241 La. 186, 127 So.2d 734; Coco v. State Farm Mut. Auto. Ins. Co., La.App. 3 Cir., 136 So.2d 288; Comment, 22 La.L.Rev. 626 (1962).
The present facts show:
Kent was a college senior, twenty-two years of age at the time of the accident. The Bennetts lived in Alexandria, but Kent attended college in Natchitoches, some fifty miles distant. The Bennetts owned two automobiles.
Every four or five weeks during his senior year (and less often during his previous college years), Kent was allowed to take back and use one of the cars at college until his return home in a week or so. When the accident occurred, some two weeks before Kent's graduation, he had brought the car with him to college two weekends before, and he had been using it at school for nine days prior to the accident. Tr. 549.
On the day of the accident, Kent and Armstrong, together with a Miss Bray and some other students, had gone on a swimming *456 picnic together at a nearby national park. When they returned to the college, they discovered that Miss Bray had left behind a borrowed bathing cap. Since Kent had to attend a banquet that evening and did not have time to return immediately to the park to search for the cap, he let Armstrong drive Miss Bray, Armstrong's date, back to the park, instead of doing so himself. The accident occurred while Armstrong and Miss Bray were en route back from the park.
In arguing that Kent did not have permission to lend the Oldsmobile to Armstrong on the day of the accident, the insurer relies upon certain testimony of Kent and his parents on direct examination. This was to the effect that the parents had given Kent general and consistent instructions over several years never to let anyone else drive a family car when Kent was allowed to take it from home. On the occasion that Kent had borrowed the Oldsmobile to use it at school in May 1963, some few days before the accident, Mr. Bennett had not had occasion to caution Kent against lending the car, while Mrs. Bennett did not remember whether she had mentioned the subject. Tr. 527.
However, certain admissions on cross-examination, as well as certain inconsistent prior statements, indicate that the prohibition against Kent lending the car to his friends was more of a cautionary policy, and that included within the father's permission to him to use the car was his parent's consent to let his friends drive the car in circumstances such as the present when his best judgment so indicated.
The father's testimony, particularly, clarifies to this effect the extent of the parents' caution to their son not to let others use the family cars when entrusted to his possession. In sworn interrogation soon after the accident, admitted in evidence at the trial, the father had in his own words described his instructions to Kent as follows: "* * * so far as being able to lay down a standard set of rules for him I don't see how you can do it. He knows he knew that the best thing he could do to take care of the car was to drive it himself, but so far as to come right out and tell him that he can't let anybody else use itit's almost impossible, to me it is. * * * [C]ircumstances might come up that somebody else might want to use it, you say `Well, I don't see anything wrong with it, go ahead.' But he had been told the best thing to do is not to do it." Exhibit J-1, Tr. 90. What the father intended by his admonition to Kent not to lend the car to others was, he stated at one point in his trial testimony, "that he [Kent] should not loan the car, not for their pleasure" (Tr. 540); at another, "except in the case where there was some emergency come up, that he should not permit anyone else to drive it but should drive it himself" (Tr. 542).
The father frankly admitted, however, as to the situations in which Kent was intended to have permission to let others drive the car, "that would have to be his [Kent's] decision to make, I would not be there; his mother would not be there; he would have the car away from home, and that would be his decision that he would have to make." Tr. 543. Thus, as both Kent and his father testified, his parents' permission for Kent to keep the car under his continuous and general control at school for a week or so at a time, contemplated that Kent could let others drive the car in exceptional situations as determined solely by his own good judgment and intelligence. Tr. 542, 553.
In addition, Kent testified that he had let his roommate (Oakley), as well as another friend (Knotts) drive the car on several occasions; that his parents knew about him letting these boys use the car, but that he continued to let these boys drive the car; and that his parents, despite their knowledge that he had let Oakley and Knotts drive the car, nevertheless continued to let Kent take it back to school for his general use. Tr. 550-553. The young man stated that he had "more or less" followed his *457 parents' instructions since he "didn't make it a practice" of lending his car to others to use. Tr. 554.
We find no error in the trial court's conclusion, under this evidence, that Kent's father had not forbidden his son to let others use the family car while entrusted to Kent's general use and continuous control away from school, and that, under the circumstances in which the insured vehicle was turned over to the named insured's son as first permittee, there was an implied consent for this first permittee to let others use the vehicle. To some extent, the trial court's conclusion represents a credibility evaluation, and we find no error in the trial court's having construed to this effect the testimony of the Bennetts.
In Coco v. State Farm Mut. Auto. Ins. Co., La.App. 3 Cir., 136 So.2d 288, this court had occasion to make an exhaustive analysis of the jurisprudence concerning the question before us. As there stated, "* * * the jurisprudence of this State has been established to the effect that where the original permittee has been granted more or less general discretion and continuous control over the insured vehicle by the named insured, such general permission carries with it the implied consent of the named insured for the original permittee to allow third persons to use the insured vehicle." 136 So.2d 293. Citations omitted.
The opinion further states, 136 So.2d 293: "In a case, however, where the original permittee has been granted the more or less general use of and continuous control over the insured vehicle by the named insured, but with the specific restriction or prohibition that he is not to permit anyone else to drive it, then we think the general permission granted to the original permittee does not carry with it the implied consent of the named insured that others may be permitted to drive the insured car." Nevertheless, as the opinion continues, 136 So.2d 295: "We can readily conceive of circumstances where the permission of the named insured for a second permittee to use the automobile may be implied, even though the named insured has specifically prohibited the initial permittee from letting someone else drive. Such permission may be implied, for instance, if the named insured has knowledge of the fact that the original permittee has permitted others to use the automobile in spite of that prohibition, and after acquiring that knowledge he makes no protest and takes no action to prevent him from continuing to do so." (Italics ours.) See also Thomas v. Peerless Insurance Co., La.App. 2 Cir., 121 So.2d 593; Comment, cited above, at 22 La.L.Rev. 535.
According to the cited Comment, "The test in the majority of jurisdictions seems to be whether the nature of the named insured's permission to the first permittee is such that it can be reasonably interpreted to include the authority for the first permittee to allow a third party to operate the insured vehicle." 22 La.L.Rev. 633. Under this test, we believe that the evidence shows that the general permission of Kent's father as named insured for Kent to use the family car at school, included within its scope, either expressly or by implication, the father's authorization for the son to let others drive the car, at least under the circumstances shown.
We affirm the trial court's holding that Armstrong therefore had the implied consent of the named insured to drive the Bennett vehicle, as a result of which he was afforded coverage as an omnibus insured by U.S.F. & G., the liability insurer of the Bennett vehicle.
2. Proration of "excess" coverage.
U.S.F. & G. thus afforded coverage to the Bennett vehicle as the omnibus insurer of Armstrong while driving it. Armstrong's negligent operation of the automobile was also insured by "drive other car" coverage afforded by liability policies issued by Traders and Travelers respectively to Armstrong's father on Armstrong family vehicles; but both of these policies contained provisions that their insurance *458 of such "non-owned" vehicles should be excess coverage (i.e., non-owned by Mr. Armstrong, the named insured).
The parties have agreed that, if the U.S. F. & G. affords coverage to the Bennett vehicle herein as we have held, then that under the "other insurance" clauses of the respective policies U.S.F. & G. is the primary insurer of Armstrong's liability, whereas as to it Travelers and Traders are merely excess insurers. See Annotation, Liability InsurersApportionment, 76 A.L. R.2d 502; 7 Am.Jur.2d "Automobile Insurance", Section 202 (p. 504). As earlier noted, Traders had issued a 5/10/5 policy, whereas Travelers's policy contained 10/20/5 limits.
With regard to the damages assessed against Armstrong in excess of the policy limits of his primary insurer (U.S.F. & G.) the question then arises, how should payment for this six thousand dollars excess be apportioned as between Traders and Travelers, the excess insurers? Equally (as the trial court held) or in proportion to the respective policy limits (as Traders contends)?
Each of the policies issued by these respective insurers contained an identical "other insurance" clause which provides as follows:
"[A.] If the insured has other insurance against a loss covered by Part I of this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; [B.] provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance." (Italics ours.)
To the extent that the clause in each policy (italicized B above) provides that the respective insurance shall be excess as to other valid and collectible insurance applicable, Travelers and Traders concede that, as between them, these clauses in the two policies are mutually repugnant and must be disregarded (so that therefore as against each other neither of these two insurers may be considered as providing only excess coverage[2]). Both insurers therefore are considered to be bound as Armstrong's excess insurers, providing coverage secondary to that of U.S.F. & G., with the excess loss over the primary (U.S.F. & G.) coverage to be apportioned between these two excess insurers. See: Annotation, Liability Insurers Apportionment, 67 A.L.R.2d 1123; 7 Am.Jur.2d "Automobile Insurance", Section 202 (p. 544).
The question remains, in what proportion is the excess award to be apportioned between these two excess insurers? Equally? Or in proportion to policy limits?
In this connection, we should here note that, in examining the jurisprudence concerning apportionment of liability between excess insurers, care must be exercised to distinguish between the different types of "other insurance" clauses in alleged conflict *459 in the decisions cited. As the excellent summary at 7 Am.Jur.2d "Automobile Insurance", Section 202 indicates, at least five different types of conflicts have arisen between the three different common types of "other insurance" clauses,[3] with different apportionment or coverage rules applicable to each. Some confusion may result if an attempt is made to apply to one type of conflict the rules peculiar to another type based upon differing policy clauses and considerations. See also 45 C.J.S. Insurance § 925b, p. 1039.
One type of conflict, for instance, may be between a "no liability" (sometimes called an "escape") clause, as against an "excess" clause. See, e.g., Lincombe v. State Farm Mut. Auto. Ins. Co., La.App. 3 Cir., 166 So.2d 920. Varying rules then apply as to the apportionment of coverage and liability between these two types of policy clauses, Annotation, Liability Insurers Apportionment, 46 A.L.R.2d, none of which necessarily apply to the present situation involving a different type of conflict.
Another, as indicated in the text above, may be where both insurers have clauses under which they afford excess coverage only if there is other valid insurance. In this situation, the respective "other insurance" clauses are usually disregarded to the extent mutually repugnant, and neither policy is held excess coverage as to the other policy involved. Ordinarily, this may result in policy provisions coming into play which provide for apportionment in proportion to the respective policy limits.
It is this latter rule which Traders (with 5/10/5 limits) urges is applicable here. If Traders is correct, then Travelers (with 10/20/5 limits) should bear twice the loss that Traders does, i.e., in proportion to the respective policy limits.
All[4] but two[5] of the cases relied upon in support of this method of apportionment *460 contain facts readily distinguishable from the present, however. In these cases, the "excess" insurers were in fact "primary" insurers, because there was no additional insurer providing coverage primary to that of the alleged excess insurers. To revert to the present policy clause quoted above, the effect of the conflict in the clauses was to delete the mutually repugnant sections which provided the coverage in question was excess only[6], so that the only effective part of the "other insurance" clause remaining was the provision that the insurers were to be liable only in proportion to the respective policy limits.[7] (This, of course, is also the rule of apportionment applicable as to the liability of two primary insurers of the same loss. See: Hospital Service District No. 1 of Parish of Plaquemines v. Delta Gas, Inc., La.App. 4 Cir., 171 So.2d 293; Bardwell v. England Transportation Co., La.App. 4 Cir., 169 So.2d 537; Spurlock v. Boyce-Harvey Machinery, Inc., La. App. 1 Cir., 90 So.2d 417, 427.)
Our present facts concern a slightly different type of situation. Since U.S.F. & G. afforded primary coverage, the liability of the present excess insurers was secondary or truly "excess".
In this type of situation, the only clause provisions considered pertinent may be those providing that the respective insurers are providing "excess insurance" as to the non-owned car (i.e., the portion of the present clause denoted as B above). The preceding portion of the clauses, providing for apportionment to be in accordance with respective policy limits (i.e., the portion of the present clause denoted as A above), may be interpreted as intended to be effective only where the policies in question afford primary rather than secondary coverage. Hartford Accident & Indem. Co. v. Selected Risks, 65 N.J.Super. 328, 167 A.2d 821 (App. Div., 1961).
Under this reasoning, there being no contrary policy provision, the excess insurers should be equally liable for the excess recovery as in the case of any other solidary obligors (until, of course, the lower policy limits are exhausted).
As the cited decision states, 167 A.2d 824, approving such interpretation as a "logical reflection of the insurers' intentions inserting this clause into their policies. A limitation was sought in instances of primary liability [only] by means of this prorating feature. Once the conditions of an accidenti.e., the fact that the assured was operating a `non-owned' or `temporary substitute' vehicleresulted in activation, as here, of the excess coverage proviso, the connection between the policy liability limits and the proportion of responsibility to be borne by each carrier becomes too remote to warrant proration on that basis. It was therefore contemplated, in our opinion, that the prorating feature would drop out at this stage."
In its reasoning, the cited decision relied upon a prior decision which applied the same rule (solidary liability rather than in proportion to policy limits), even though the liability of the excess insurers for the loss was primary rather than (as now) secondary to yet a third insurer which afforded primary coverage priming that of the excess insurers. Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co., 28 N.J. 554, 147 A.2d 529, 69 A.L.R.2d 1115 (1959).[8] In holding that the policy intent of the insurers was to divide excess coverage equally (rather than in proportion to policy limits, as with primary coverage), the court stated most cogently that an excess insurer should not be required to bear a greater loss than another *461 after exhaustion of primary coverage, because, 147 A.2d 534: "It is commonly known that the cost of liability insurance does not increase proportionately with the policy limits. The cost of increased limits is relatively small when compared to the cost of minimum coverage."[9]
At least in instances where the excess coverages are indeed secondary to a primary coverage afforded by yet another insurer,[10] we agree with these cited cases that equal apportionment of the excess recovery against excess insurers, is supported by the better legal and economic reasoning, as being more within the intention expressed by the insurance contracts; than is the method which apportions such "secondary" excess liability in proportion to the policy limits, as in the case of purely primary coverage. The only cases involving this precise situation (see Footnote 5 above) which did apportion secondary excess liability according to policy limits, simply applied mechanically and without discussion the policy-limit proportion in prorationing liability, in accordance with the majority rule followed where the liability of the "excess" insurers is not (as here) secondary to a truly primary insurer (see Footnote 4 above).
By reason of this conclusion, we regard the proration feature of the "other insurance" clauses in the Traders and Travelers policies as not applicable. Consequently, these two excess insurers are solidarily liable for the excess up to the lowest policy limits applicable. To that extent, the debt therefore should be divided equally between them. LSA-C.C. Art. 2103. (Of course, when the lower policy limits are exhausted, then the insurer with the larger limits is responsible for the remainder due up to its policy limits; but we are not faced with this situation here, where the equal division of the six thousand dollars excess recovery does not result in a recovery greater than the policy limits against either insurer.)
We affirm our trial brother's holding to this effect.
Quantum.
The trial court awarded the plaintiff Miss Peterson $12,000 general damages for her personal injuries, plus $2,155 special damages (mostly for future medical expenses which the evidence indicates will be necessary). Miss Peterson's father was awarded $834.62 medical expenses incurred by him prior to her majority. The plaintiff appeals the award of general damages as inadequate, while the defendant insurers question the award as excessive.
Without detailing the serious and painful injuries, with permanent residuals including some shoulder disability and some shoulder, knee, and (minimal) facial scarring, it will suffice to say that the award of general damages did not constitute an abuse of the trial court's large discretion in the matter, and that the decisions cited by the defendants to justify reduction of the award by five thousand dollars do not indicate that the present trial award is an abuse of discretion as out of all proportion with prior awards. Ballard v. National Indemnity Co., 246 La. 963, 169 So.2d 64.
The plaintiff's principal complaint is that the trial court overlooked an award for a few items (specifically: a minor concussion *462 of the brain at the time of the accident, a "possible" internal derangement of the knee without clinical symptoms, see Dr. Young pp. 12-13, 23, a residual scar from shoulder surgery). However, we feel, reading the trial court opinion as a whole, that our trial brother took these injuries into account in making his award of general damages, and that the award of twelve thousand dollars for all injuries including these was neither manifestly excessive nor manifestly insufficient.
Decree.
For the foregoing reasons, the judgment of the trial court is affirmed. The plaintiff-appellant is to pay one-half the costs of appeal; the defendants-appellants one-half.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] Liability insurance contracts with policy limits for bodily injuries of five thousand dollars per person, not to exceed ten thousand per accident, and with five thousand dollars policy limits for property damage.
[2] However, as to U.S.F. & G. which had a similar clause in its policy which insured the Bennett car (which thus was not a "non-owned" car as to U. S. F. & G.), the clause did have the effect of making Travelers and Traders merely excess insurers as to U. S. F. & G.'s primary coverage. See Annotation, 76 A.L.R.2d 502 and 7 Am.Jur.2d "Automobile Insurance", Section 202, cited earlier in text discussion. For U. S. F. & G.'s "other insurance" clause (providing primary insurance as to the insured Bennett vehicle and excess only to a non-owned one) was not repugnant with the similar "other insurance" provisions in the Travelers or Traders policies insofar as the latter's clause limited coverage to "excess" as to non-owned vehicles, such as the Bennett vehicle (insured by U. S. F. & G., however, as its insured-owned vehicle). See, e. g.: Hurdle v. State Farm Mut. Auto. Ins. Co., La. App. 2 Cir., 135 So.2d 63, 68; O'Brien v. Traders and General Ins. Co., La. App. 1 Cir., 136 So.2d 852, 865.
[3] The opening paragraph of the encyclopedia section states as follows, 7 Am. Jur.2d 544:

"Many cases have arisen involving conflicts between insurance policies both of which purport to restrict or escape liability for a particular risk in the event that there is other insurance. Such conflicts have arisen, under automobile liability policies covering the same risk, in the following situations: (1) where one of the policies contains an `excess insurance' clause and the other contains a `pro rata' clause; (2) where one of the policies contains an `excess insurance' clause and the other a `no liability' clause; (3) where both of the policies contain an `excess insurance' clause; (4) where one of the policies contains a `pro rata' clause and the other contains a `no liability' clause; and (5) where a `no liability' clause expressly designates the types of insurance with which it might conflict."
The remaining portion of the section text summarizes the varying resolutions of the different types of conflicts.
[4] Farmers Insurance Exchange v. Fidelity & Casualty Co. of New York, Wyo., 374 P.2d 754 (1962); Reetz v. Werch, 8 Wis. 2d 388, 98 N.W.2d 924 (1959); Ermis v. Federal Windows Mfg. Co., 7 Wis.2d 549, 97 N.W.2d 485 (1959); Continental Casualty Co. v. Buckeye Union Cas. Co., Ohio Com.Pl., 143 N.E.2d 169 (1957); Farmers Ins. Exchange v. Continental Nat. Group, 213 Cal.App.2d 91, 28 Cal. Rptr. 613 (1963); Continental Casualty Co. v. Hartford Acci. & Indemn. Co., 213 Cal.App.2d 78, 28 Cal.Rptr. 606 (1963); Athey v. Netherlands Ins. Co., 200 Cal.App.2d 10, 19 Cal.Rptr. 89 (1962); Truck Ins. Exchange v. Torres, 193 Cal.App.2d 483, 14 Cal.Rptr. 408 (1961); Continental Casualty Co. v. New Amsterdam Casualty Co., 28 Ill.App.2d 489, 171 N.E.2d 406 (1960); Arditi v. Massachusetts Bonding & Ins. Co., Mo., 315 S.W.2d 736 (1958); Oregon Auto. Insurance Co. v. United States F. & G., 195 F.2d 958 (C.A.9th Cir., 1952); Continental Cas. Co. v. St. Paul Mercury Fire & Marine Ins. Co., 163 F.Supp. 325 (D.C.Fla.1958); Bradshaw v. St. Paul Fire & Marine Ins. Co., 226 F.Supp. 569 (D.C.Ga.1964).
[5] Oil Base, Inc. v. Transport Indem. Co., 143 Cal.App.2d 453, 299 P.2d 952 (1956), remittitur corrected, 148 Cal.App.2d 490, 306 P.2d 924; Employers Liability Assurance Corp., etc., v. Pacific Employers Ins. Co., 102 Cal.App.2d 188, 227 P.2d 53 (1951), overruled on other grounds in Continental Casualty Co. v. Phoenix Constr. Co., 46 Cal.2d 423, 296 P.2d 801, 57 A.L.R.2d 914 (1956).
[6] As in the portion denoted as B in the present insuring clause quoted in the text above.
[7] As in the portion denoted as A in the present insuring clause quoted in the text above.
[8] To same effect, see: Nationwide Mutual Ins. Co. v. State Farm Mutual Ins. Co., 209 F.Supp. 83 (N.D., W.Va.; 1962). Allstate Insurance Co. v. Atlantic National Insurance Co., 202 F.Supp. 85 (S.P., W.Va.; 1962).
[9] For the sake of completeness of discussion, we do not believe it inappropriate to note the decision's rejection of yet a third rule of apportionment used in an isolated case or two, the proration of liability according to the premiums paid the respective companies. See Insurance Co. of Texas v. Employers Liability Assur. Corp., 163 F.Supp. 143 (S.D.Cal., 1958). In the Cosmopolitan decision, the court stated, 147 A.2d 534: "Although this latter test initially commends itself, upon reflection it appears that unless the insureds are in identical circumstances, there are too many variables affecting the premiums to permit them to form an adequate basis for an equitable adjustment * * *."
[10] We expressly do not pass upon the proper method of apportionment where the "other insurance" coverage of the two insurers is in fact primary coverage, as in the cases cited in Footnote 4.