REGAN, Judge.
The plaintiff, Mrs. Rita Mae Byrd, filed this suit against the defendants, Whitney G. Fulton, his wife, Mrs. Lena G. Fulton, and Phoenix of Hartford Insurance Company, the liability insurer of the Fulton vehicle, endeavoring to recover the sum of $90,000, representing damages which she alleges were sustained as the result of an automobile accident which occurred on U. S. Highway 90 near its intersection with Alba Road in New Orleans.
*385 The defendants answered and denied the accusations of negligence contained in the plaintiff’s petition. However, the defendants’ liability to the plaintiff was subsequently stipulated, and the trial was devoted to a determination of the quantum of damages to which the plaintiff might be entitled.
After a trial on the merits, the lower court rendered a judgment in favor of the plaintiff for the sum of $65,000. From that judgment, the defendants have prosecuted this appeal. The plaintiff answered their appeal and requested that the judgment be increased to $75,000.
The record discloses that the collision occurred at 4:30 p. m., on January 27, 1968. The plaintiff, a woman 51 years of age, was a guest passenger and occupied the right front seat of an automobile driven by her husband. The photographs and other evidence inscribed in the record clearly reveal that the accident was most severe, causing the complete demolition of both vehicles. Plaintiff was rendered unconscious. The hospital records disclose that she was removed from the scene of the accident to Charity Hospital in New Orleans, and from there transferred to Touro Infirmary by ambulance while undergoing intravenous infusion. Upon admission, her condition was listed as critical, and it was medically apparent that no more than secondary preservative procedures, such as debriding or cleansing of her wounds and injuries, could be accomplished at that time.
Plaintiff’s injuries were diagnosed as a cerebral concussion with the possibility of traumatic subarachonid hemorrhage, a comminuted fracture of the left humerus, an avulsed laceration of the right leg below the knee, fractures of four ribs, and multiple lacerations of the face and scalp.
Plaintiff’s treating physician was Dr. Irving Cahen, a respected orthopedic surgeon. Because of the other injuries incurred by the plaintiff, he immediately sought the services, on a consulting basis, of other specialists including Dr. Arnold Lupin, an internist, and Dr. Richard W. Levy, a neurosurgeon.
Dr. Cahen’s chief concern was the severity of brain damage, which conclusion was substantiated by Dr. Levy’s recommendation that nothing be done other than to give supportive therapy and to keep the plaintiff under observation. Consequently, surgical intervention was not possible for some eight days. After regaining' consciousness, the testimony of Dr. Cahen and of lay witnesses shows conclusively that Mrs. Byrd was confused, disoriented, and irrational. In spite of the fact that heavy sedation was administered and despite the fact that her left arm was in traction, it was nevertheless necessary to place the plaintiff under physical restraint to keep her from thrashing about. Dr. Cahen classified her condition during this period of her hospitalization as “rather wild.”
On February 5, 1968 Dr. Cahen and Dr. Richard W. Vincent, a plastic surgeon, performed surgery to the wound appearing on the plaintiff’s right leg. The injury was below the kneecap and was roughly triangular in shape. Two sides of the wound were severed, and the third side, which formed the base of the triangle, was attached to the plaintiff’s leg. The laceration was sufficiently deep so as to expose the bone beneath it. The surgery consisted of cleansing and irrigating the wound, removing necrotic tissue, and the area was reconstructed as well as was possible under thé circumstances. Some areas of tissue were regarded as questionable as to their vitality but they were permitted to remain in the wound with the hope that they would heal. The wound was closed with sutures, a pressure dressing applied, and a cast was then fitted to the leg for the purpose of immobilization. It remained on Mrs. Byrd’s leg for approximately two or three weeks when it was removed before she was discharged from the hospital on February 28, 1968. Dr. Vincent and Dr. Cahen continued to treat her for her leg injury for several months, and it was pos *386 sible for them to reduce limitation of motion to the point where she only felt discomfort when she placed her leg in a kneeling position. It was established by medical evidence adduced in connection therewith that she could not kneel for any period of time without experiencing pain.
On February 17, 1968, Dr. Cahen performed an operation to reconstruct the fracture to the plaintiff’s left humerus. He related that the fracture was commi-nuted, in that more than one fracture line was present. Plaintiff’s shoulder area had been disrupted, including that part of the bone which fits into the scapula, or shoulder blade, with the total result that plaintiff’s arm was disaligned. Moreover, a tendon was caught in the bone fragment and several muscles were torn from their points of attachment to the bone. The bone fragments were placed in alignment and secured with a metal pin. The arm was then placed in a cast and remained therein for approximately six weeks, or until March 29, 1968. Dr. Cahen was visited by the plaintiff at frequent intervals until September 27, 1968, at which time he examined her and offered advice with respect to exercise, massage, and therapy. He thereafter discharged her for the reason that he had accomplished as much as he could orthopedically.
Subsequent evaluation by Dr. Cahen disclosed that the plaintiff had permanent difficulty in raising her arm above shoulder level, and as a result he estimated her disability as a 5% limitation in the function of the shoulder.
No special treatment was administered to the plaintiff for her four broken ribs, since she was confined to bed in any event by her other injuries, and bed rest is the usual recommendation for injuries of this nature. Her ribs healed with little or no residual effect.
Dr. Cahen also testified with respect to the lacerations of plaintiff’s forehead and scalp. He explained that when her head struck the windshield, the glass shaved the skin and hair on her forehead back into the scalp, and there also resulted a split in some of the skin layers of the temple. The laceration also extended into the eyebrow, and Dr. Cahen sutured skin containing plaintiff’s hair follicles back in place for cosmetic purposes. There was also a cut on her lip, which caused Mrs. Byrd no difficulty. According to Dr. Cahen, the facial and head lacerations healed reasonably well, and they are somewhat difficult to see.
The most serious injury incurred by the plaintiff obviously resulted from her head striking some object in the vehicle. Dr. Cahen testified that during his treatment of Mrs. Byrd she continued to complain of headaches and vertigo, and she was still complaining of these symptoms when he discharged her. It was his understanding that she was going to consult another physician for this condition for the reason that she staggered when she walked.
Dr. Cahen’s clinical opinion as to the seriousness of plaintiff’s head injury is well expressed by the following excerpt from his testimony, given in explanation of the delay involved in engaging in surgical intervention after the plaintiff was admitted to the hospital.
“Then, as I said, she had had a head injury. And while she was gradually improved, it was — I felt it best to wait a little bit longer. The treatment of the severe fracture is important to get reduction of the bone; it is also important to have a patient who stays with you.”
In late November or early December of 1968, the plaintiff was examined by Dr. Louis J. Rutledge, a specialist in the field of otolaryngology. The reports from Dr. Rutledge which were stipulated into the record, reveal that on his initial examination he found sufficient ground to recommend that she undergo audiometry and a balance test. Thereafter, he concluded that she had evidence of true vertigo originating from irritation within the central nervous system. He concluded that there was a causal connection between the accident and plaintiff’s vertiginous condition. *387 On June 5, 1969, Dr. Rutledge further reported that her condition was controlled with medication.
Dr. Rutledge left Louisiana shortly thereafter, and the plaintiff then consulted Dr. Wallace Rubin, a practitioner of neu-rotology, a subspecialty of otolaryngology. Dr. Rubin conducted numerous tests, including an electronystagmogram, a test which, like an electrocardiogram, the results of which can not be voluntarily controlled or feigned by the patient. Dr. Rubin emphasized that plaintiff’s condition is true vertigo, caused by damage to the inner ear as the result of the trauma involved in her automobile accident.
Moreover, he expressed the opinion, predicated on the plaintiff’s history of vertigo and his experience in treating this ailment, that in view of the length of time during which the condition persisted plaintiff would in all probability suffer therefrom indefinitely. At the time of the trial, both the plaintiff and this physician asserted that she suffered from attacks of vertigo on the average of once every two weeks.
The testimony of Mrs. Byrd, her daughter, and her lessor, Mrs. Ester Aupied, established that since the accident the plaintiff had undergone noticeable personality changes, suffered from periodic dizziness and nausea and was unable to leave the house without an escort. Mrs. Aupied testified that the plaintiff will walk to the grocery store if accompanied by someone, but pointed out that on several occasions the neighborhood children laughed at her because of the way she walked; they apparently thought that she was intoxicated.
Plaintiff’s daughter explained that since the accident her mother was very emotional, being both easily depressed and easily excited.
From the evidence inscribed in the record we are compelled to reach the inevitable conclusion that because of head injuries incurred as a result of the accident the plaintiff is no longer able to function as she did prior thereto and is not capable of carrying on the ordinary activities of life. (Moreover, medical evidence was adduced herein to show that she will not significantly improve.)
Since the Louisiana Supreme Court rendered its decision in the case of Gaspard v. LeMaire,[1] the doctrine is well settled to the effect that in personal injury cases appellate courts should view the damages sustained by the injured party on their own merits and that awards made by the trial court should only be disturbed in those cases where they are manifestly excessive or manifestly inadequate. In the course of arriving at this conclusion the court rationalized that awards in other cases with similar injuries should serve only as a guide in determining the adequacy or inadequacy of the trial court’s award.
In the present case, the defendants insist that the award of $40,000 in Berry v. Gulf Coast Construction Company,[2] and the award of $30,000 in Poche v. Frazier,[3] demonstrate that the judgment of the lower court was sufficiently high to justify a reduction thereof by us. On the other hand, the plaintiff argues that the award of $75,000 in Bourgeois v. State of Louisiana,[4] and the award of $100,000 in Debautte v. Southern Farm Bureau Casualty Ins. Co.,[5] compel this court to raise the lower court’s award from $65,000 to $75,000. We notice nothing in these cases and other cases cited by each litigant sufficient to convince us that the lower court abused its discretion in assessing damages against the defendants so as to warrant our changing its determination of the monetary value of plaintiff’s injuries. Viewing this case on its own merits and in its *388 totality, the severity of the plaintiff’s head injuries, the terrifying experiences undergone by her as a result of the accident and her subsequent recuperative period, together with the residual damages incurred by her are amply sufficient to justify the lower court’s award of $65,000.
For the same reason, that is, the rationale emanating from Gaspard v. LeMaire, there is no merit in the plaintiff’s argument that the judgment should be increased from $65,000 to the sum of $75,000. In short, the facts hereof fully justify the award made by the trial court and we will not disturb it.
For the foregoing reasons, the judgment of the lower court is affirmed. The defendants are to pay all costs of these proceedings.
Affirmed.

. 245 La. 239, 158 So.2d 149.

. 229 So.2d 368 (La.App.1969).

. 232 So.2d 851 (La.App.19TO).

. 255 So.2d 861 (La.App.1971).

. 170 So.2d 234 (1964).