281 So.2d 170 (1973)
Dorothy J. YORK
v.
Junius SEDOTAL et al.
No. 5218.
Court of Appeal of Louisiana, Fourth Circuit.
July 3, 1973.
Rehearings Denied August 21, 1973.
Writs Refused October 19, 1973.
*171 Ogden & Ogden, Charlton B. Ogden, II, New Orleans, for plaintiff-appellee.
Beard, Blue, Schmitt & Treen, George R. Blue and Melvin W. Mathes and Drury, Lozes & Curry, James H. Drury, and Madison C. Moseley, New Orleans, for Roger Seligman and Employers Commercial Union Group, defendants-appellants.
Wicker, Wiedemann & Fransen, Lawrence D. Wiedemann, New Orleans, for Junius Sedotal and Aetna Ins. Co., defendants-appellees.
Before SAMUEL, STOUGLIG and BAILES, JJ.
STOULIG, Judge.
This appeal arises from a $450,000 jury verdict to Dr. Dorothy York for personal injuries she sustained while a guest passenger in a two-car collision. Named defendants were Roger Seligman, driver of the car in which plaintiff was riding; Junius Sedotal, the other motorist; and their respective insurers. After a lengthy trial, the jury concluded Seligman's negligence was the sole proximate cause of the accident and accordingly cast him and his insurer, Employers Commercial Union Group, in judgment. These two defendants have appealed. Sedotal and Dr. York have neither appealed nor answered the appeal.
Appellants vigorously contest the fixing of liability. They urge the evidence proves Sedotal's negligence was the sole proximate cause, or alternatively, that it was a contributing efficient cause of the accident. We find no merit in either contention.
In reviewing the testimony of plaintiff and both driversthe only eyewitnesseswe note certain inconsistencies in their respective accounts, but these are insufficient to justify our reversing the jury's factual finding on the issue of negligence under the manifest error rule. It is apparent the jury concluded the accident happened as follows:
On January 9, 1970, Seligman, having picked up plaintiff at her home to escort her to a party, was driving in the extreme right lane of South Claiborne Avenue toward downtown New Orleans. As he approached the intersection of Adams Street and in negotiating a slight left curve in South Claiborne Avenue, he partially crossed the line dividing the right and middle traffic lanes. At that point in time, the automobile driven by Sedotal was proceeding in the same direction as the Seligman vehicle, immediately to its rear in the adjoining middle lane. When Seligman's car suddenly encroached on the middle traffic lane, its left rear side came in contact *172 with the right front and side of Sedotal's automobile. The impact caused Seligman to lose control of his car, causing it to knock over a stop sign regulating traffic on Adams Street and to violently strike a telephone pole immediately beyond the intersection.
In the trial court, at the request of the plaintiff the jury was properly instructed that each driver had the burden of exculpating himself from negligence contributing toward the injuries of the innocent guest passenger. We are likewise bound by this ruling expressed in the case of Jordan v. Great American Insurance Company, 248 So.2d 363 (La.App. 4th Cir. 1971).
Since Seligman admitted his vehicle had moved from the right lane into the middle land immediately before the impact, he carried the burden of proving this maneuver had no causal connection with the occurrence. His testimony that at no time did he look to the rear before moving into the middle lane confirms his negligence. Obviously this driver failed to fulfill the duty exacted by LSA-R.S. 32:104, which requires a motorist to ascertain it is safe to change lanes without interfering with overtaking traffic. Ward v. Aucoin, 222 So.2d 628 (La.App. 4th Cir. 1969).
As to whether the other driver proved he was not a contributing proximate cause, we note his testimony of itself might be suspect were it not supported in the most crucial detail by plaintiff and Seligman. These three eyewitnesses place the Seligman vehicle partially in the right and middle lanes at the moment of collision.
According to Sedotal the sudden and unexpected confrontation of the Seligman vehicle entering his traffic lane afforded him no reasonable opportunity to take the necessary evasive action to avoid contact. The jury apparently accepted the testimony and discounted any significance to the fact that Sedotal had been drinking prior to the incident.
Finding no manifest error, we affirm the jury's conclusions on negligence.
We now turn our attention to the issue of quantum. Appellants claim that the award of $450,000 is excessive. As is usually encountered, the verdict merely sets forth the aggregate amount of the award. It does not detail either the nature of the damages recognized or the particular sums assessed. To ascertain the reasonableness of the total amount awarded, we must separately consider and evaluate the following compensable elements of damages allegedly sustained: (1) injuries, pain and suffering (past and future); (2) past and future medical expenses; (3) loss of income; and (4) loss of future earnings.
In so doing we are mindful of the Supreme Court ruling in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), which underlines the limitations imposed on appellate tribunals in reviewing quantum. In that case and in subsequent jurisprudence explaining its import we are reminded that LSA-C.C. art. 1934(3) gives a trial judge or jury "much discretion" in fixing quantum, and it is not our function to disturb these awards simply to achieve uniformity. We may only look to similar cases as guides in determining whether the much discretion vested in the lower court has been abused. (See Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964).
INJURIES, PAIN AND SUFFERING (PAST AND FUTURE)
Plaintiff was seated on the passenger side of the front seat when the Seligman car struck the telephone pole. She was briefly rendered unconscious at the scene of the accident. Due to her complaints of injury she was transported to Southern Baptist Hospital for examination.
*173 Shortly after her arrival at the hospital, plaintiff was examined and treated by Dr. Claude Williams, an orthopedist. He noted swelling of the right shoulder, superficial abrasions of the legs, and two lacerations of the lower extremities. X rays revealed a fracture and dislocation of the right shoulder. The head of the arm bone was out of the shoulder joint and the bone itself was broken just below the head. The break consisted of two major and two minor fractures. To alleviate the pain and muscle spasms and to secure a proper alignment, the injured members were placed in traction.
After several days of observation, it was determined that this method of treatment was ineffective and that surgical intervention was necessary. During the operative procedure, Dr. Williams observed bruises and bleeding of the muscle in the front shoulder joint, disruption of the attachment of the tendons to the bones, in addition to the shoulder joint dislocation and the bone broken into four fragments. Also the small muscles under the large muscle of the shoulder were pulled off and attached to small bone fragments. Nerves and blood vessels were stretched but not completely torn. The surgery itself was considered to be a limited success, because of the inability to internally fix the shoulder with satisfactory solidarity due to the lack of sufficient bone through which sutures, screws, or bolts could be placed. Traction was again necessary to add stability to the alignment of the fractured member.
During her 53 days of confinement in the hospital, plaintiff remained mostly in traction. She was discharged on the condition that she receive round-the-clock care, and for this purpose she resided in her mother's house for the following two and one-half months. In this period plaintiff began a regimen of physical therapy to recover the use of her right arm and shoulder. She also remained under the treatment of Dr. Williams.
On April 8, 1970, X rays revealed cystic changes in the head of the arm bone (humerus) and some irregularity of the shoulder joint. This indicated plaintiff had suffered traumatic arthritis and necrosis to the humerusa dying of the bone because of the loss of blood supply. Crepitus, or a grating of the shoulder bone, was first noted in July, 1970.
Due to plaintiff's diligent and determined therapeutic exercises, there was a noticeable improvement in her shoulder motion by September, 1970; however, she had a limitation of 45 degrees external rotation. During this intervening period of time plaintiff experienced persistent pain which radiated into her arm and forearm.
The October 22, 1971 examination by Dr. Williams reflected findings of slight atrophy of two of the four muscles that form the rotor cuff (controlling internal and external rotation); crepitus of the right shoulder; external rotation of the right shoulder 15 degrees as opposed to the external rotation of the normal left shoulder of 75 degrees, or an increase in limitation to 60 degrees; weakness of the elbow on certain motions and a partial dead bone in the head of the humerus. Her disability was rated at 25 to 30 percent of impairment of function of her right upper extremity.
It is Dr. Williams' prognosis that in this type of injury there is a tendency for the bone to lose its blood supply and for the degenerative process of traumatic arthritis to be accentuated. Should this occur and the resulting pain becomes unbearable or the plaintiff loses the strength in her shoulder, then the operative procedure of fusion of the shoulder (to relieve pain and stabilize the joint) or prothesis (replacement of dead bone with an artificial bone of stainless steel) would become necessary. Either of these procedures would require two weeks of hospitalization and a period of recuperation up to three months. In her present condition the plaintiff will *174 tire more readily in her right shoulder and because of its instability in certain positions she cannot perform all of the small detailed activities with her fingers.
At the time of the trial, plaintiff had a rating of a 30-percent disability to her right arm and shoulder. She is right handed. As a result of her injury, she has lost stability in the shoulder, strength in the right arm and hand, and dexterity in the use of her fingers. She is no longer able to perform many of the functions of a pediatrician. Thus, some of the skills acquired through long years of education and practice have been obliterated by this residual disability.
Before this accident plaintiff performed all minor surgery. This she can no longer do. Routine examinations have now become difficult because she is unable to handle the patient and the instruments at the same time. As she described it "* * * one half of them move the whole time, it's only the newborn and the older ones that cooperate. You have to wiggle with them." Plaintiff summed up the effect of her disability this way:
"Professionally, well I can't do anything that entails any speed, dexterity, precision or any endurance, and detailed coordinated movements."
The major injury the plaintiff suffered was to her right shoulder. She also suffered a traumatic neurosis, according to Dr. Harrison Wynne, a psychiatrist who treated plaintiff professionally during her hospitalization and who has known her socially for many years. He indicated that her deep concern over the uncertainty of her ability to resume the practice of her profession only increased her anxious and depressed mental state which was compounded by the fact that she was involved in an automobile accident in 1949 in which her husband was killed. It was his observation that she was "permanently damaged in that at this time, some * * * 22 months * * * following the accident she still shows considerable residual * * tendency of depression, * * * lack of drive, decreased good spirits and tendency to over react."
Considering the injuries to the shoulder, the duration and intensity of the pain in connection therewith; the hospitalization and treatment involved; the loss of skill resulting therefrom; and the mental stress and anxiety produced as a result of the accident, we think an award of $65,000 for her injuries and past and future pain and suffering is warranted.
Defendants have cited numerous quantum cases[1] with awards ranging from $12,000 to $75,000 in urging the verdict in this case is excessive.
It appears to us that the plaintiff herein has been and will be experiencing greater pain and suffering than did the claimant in Byrd v. Fulton, 259 So.2d 384 (La.App. 4th Cir. 1972). And while it is also apparent her injuries are not as extensive as those of plaintiff in Winzer v. Lewis, 251 So.2d 650 (La.App. 2d Cir. 1971), they had the effect of partially destroying a skill acquired through years of education and experience. Also in both Byrd and Winzer, we are given no indication what degree of future pain and suffering, if any, was projected for either claimant.
What impresses us in this case is the treating orthopedist's description of plaintiff's condition as severely painful and his projection that the pain will probably intensify in the future to the point where she may be required to seek remedial surgery.
*175 PAST AND FUTURE MEDICAL EXPENSES
The undisputed past and future medical expenses are itemized as follows:

 Hospital bill $ 3,670.90
 Dr. Williams 1,643.00
 Special nurses 4,837.50
 Future surgery 700.00
 Future hospitalization 2,000.00
 __________
 $12,851.40

On this amount defendants are entitled to a credit of $5,000, the sum previously tendered to plaintiff under the medical pay provision of Seligman's insurance contract.
LOSS OF PAST INCOME
To establish loss of income between the date of the accident and the date of trial, plaintiff adduced the testimony of a certified public accountant who, working with information furnished by plaintiff, projected the income lost in 1970 and for 10 months in 1971.
From the date of the accident (January, 1970) through March of 1971, another pediatrician helped plaintiff with her practice. From June to December 1970, plaintiff worked on a part-time basis as her strength would permit. In 1971, she returned to as active a practice as she will be able to undertake in the future.
George Hill, the certified public accountant called by plaintiff, working with projected gross billings for 1970 had plaintiff been working at full potential as compared with 1969 billings, plus a 2.5 inflationary factor, testified she lost $43,559 in income in 1970. We will not detail how he arrived at this figure because it is unrealistic on its face. In 1969, Dr. York reported a net income of $28,521. Thus we find it incredible that her loss for the following year could have exceeded her net income for the previous year by some $15,000. Hill explained the discrepancy by asserting plaintiff reported on a cash rather than an accrual basis. We also note that this witness relied upon information furnished without examining plaintiff's record of account to verify its accuracy.
This theory was discounted by Jewel Bates, a certified public accountant called by the defendant, whose sources of information were the records and income tax returns of Dr. York. While he agreed that a cash basis is not as precise as an accrual method of accounting, he explained that in a practice like plaintiff's the receipts and disbursements that overlapped from one year to the next average out and present a fairly accurate picture of net income. His method of calculating loss would be to average out the last preceding five years' net income and compare this average figure to the 1970 net. Her net income reported for 1965 was $18,000; for 1966, $14,000; for 1967, $34,000; for 1968, $28,000; and for 1969, $28,000. Averaged this would produce a net of $24,900.
Bates suggested the best way to determine loss of income for 1970 was to subtract the net reported for that year from the average net for the past five years. We agree with the use of comparative net income figures, but in view of the fact that the practice was apparently growing, we think it is fairer to use the 1969 net income as the figure against which to compare the 1970 income. In 1970 she reported a net income of $17,800. We determine her loss for 1970 was $28,000-$17,800=$10,200. According to Bates, plaintiff would have reported a net income of $22,000 in 1971. This calculation is based on 10 months of actual receipts and a projection of November and December income based on the previous year's experience. This case was tried in November, 1971. Using the 1969 base and subtracting the 1971 net therefrom ($28,000-$22,000), we arrive at a loss in 1971 of $6,000. The total loss of income for both years is thus determined to be $16,200.
LOSS OF FUTURE INCOME
Finally we consider loss of future income. In McFarland v. Illinois *176 Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961), the Supreme Court reversed a court of appeal decision which increased a damage award, and in so doing reinstated a considerably lower jury verdict. This court increased the quantum by computing loss of future earnings to a mathematical certainty. The Supreme Court specifically disapproved this method of computing future loss of earnings. The reasoning is that future earnings are not capable of being projected with scientific certainty. That opinion suggests "sound judicial discretion" should be applied in estimating future loss of income. In later cases, appellate courts have projected future earnings based on remaining work years and discounted the amount of cash to its present value, using these figures as a guide in the exercise of sound judicial discretion. In Barrois v. Service Drayage Company, 250 So.2d 135 (La.App. 4th Cir. 1971), writ refused, 259 La. 805, 253 So.2d 66 (1971), this court used such a projection to assist it in arriving at a figure and noted the finder of fact was not bound by the computation. Thus we interpret the refusal of the writ tantamount to approval of using mathematical projections as one of the guides to aid us in exercising our judicial discretion. Plaintiff's certified public accountant suggested a method of computing loss of future income which we adopt in part. Plaintiff will be 65 years old toward the end of 1982. For the purpose of computing her loss, we assume she has practiced to full capacity in 1971 within the limitation proscribed by her disabling condition, and for the next 11 years, if she were to maintain the same work schedule, she would sustain the same net loss each year. Thus between 1972 and 1983 it may be projected her total loss will be $66,000.
Hill further projected plaintiff will phase out her practice between her 66th and 70th year at the rate of 10 percent per year. Accordingly her projected loss would be reduced by 10 percent the first year, 20 percent the second, etc. For this five-year period her loss would total $21,000.
In most cases we would discount these projected figures to their present day cash value by applying the formula furnished in the discount table in LSA-R.S. 47:2405. However, because Dr. Williams' prognosis is that the traumatic arthritis will probably further restrict the motion in plaintiff's shoulder as the disease progresses, it is foreseeable that she may have to limit her practice considerably more than she did in 1971. Considering that plaintiff's external rotation of the right shoulder decreased from 45 degrees on September 2, 1970 to 15 degrees on October 22, 1971, evidencing a progressively more restricted movement of this member, Dr. Williams' prognosis of further future limitation of motion is established with a reasonable certainty. We take this factor in consideration and balance off the discount against the possibility of a further restricted practice long before retirement age.
We summarize our award of quantum as follows:

 Injury, pain and suffering $ 65,000.00
 Past and future medical $12,851.40
 less credit 5,000.00 7,851.40
 __________
 Loss of past income 16,200.00
 Loss of future income 87,000.00
 ___________
 $176,051.40

We conclude the much discretion vested in the jury in fixing quantum by LSA-C.C. art. 1934(3) was abused in the instant case.
For the reasons assigned, the judgment appealed from is amended to decrease the award from $450,000 to $176,051.40 and, in all other respects, affirmed. Plaintiff is to pay the cost of this appeal.
Amended and affirmed.
NOTES
[1] Byrd v. Fulton, 259 So.2d 384 (La.App.4th Cir. 1972) ($65,000); Winzer v. Lewis, 251 So.2d 650 (La.App. 2d Cir. 1971) ($50,000); Vonderbruegge v. Bethea, 250 So.2d 407 (La.App. 1st Cir. 1971) ($30,000); Vick v. Hanover Insurance Company, 221 So.2d 523 (La. App. 2d Cir. 1969) ($12,000); Peterson v. Armstrong, 176 So.2d 453 (La.App. 3d Cir. 1965) ($12,000).