323 So.2d 855 (1975)
Mrs. Mary Cavanaugh MORGAN et al.
v.
LIBERTY MUTUAL INSURANCE COMPANY et al.
No. 7045.
Court of Appeal of Louisiana, Fourth Circuit.
November 11, 1975.
Concurring Opinion November 14, 1975.
On Denial of Rehearing and Amendment of Decree December 19, 1975.
*856 Wiedemann & Fransen, Lawrence D. Wiedemann, New Orleans, for Mrs. Mary Cavanaugh Morgan, plaintiffs-appellees.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John V. Baus, New Orleans, and Timothy T. Roniger, for Liberty Mutual Ins. Co., and others, defendants-appellants.
Bienvenu, Foster, Ryan & O'Bannon, Hugh M. Glenn, Jr., New Orleans, for Peter Kiewit Sons' Co. and the Home Indemnity Co., intervenors-appellees.
Before REDMANN, STOULIG and GULOTTA, JJ.
STOULIG, Judge.
John Morgan,[1] rendered paraplegic and mentally incompetent in an industrial accident, won a $2,481,000 jury verdict against defendants, Riley Stoker Corporation (Stoker), and its liability insurers, Liberty Mutual Insurance Company (Liberty Mutual) ($1 million limits) and American Home Assurance Company (American) (the excess carrier). Defendants[2] have appealed.
We affirm on liability and amend quantum to $1,427,365.72.
*857 On October 4, 1973, while working as a pipefitter foreman for Peter Kiewit Sons' Company (Kiewit) at a generator plant construction site at Kilona, Louisiana, John Morgan was critically injured when two corrugated metal sheets[3] fell from a height of 160 feet, caromed off the building, struck the ground and fell on Morgan.
It is not disputed this accident occurred through the negligence of employees of defendant Stoker, who, like Kiewit, was one of many subcontractors working on this job.
Originally, William Baldwin, Sr., foreman of the Stoker crew engaged in moving the metal, told Alfred Giavotelia, his "rigger," to move the sheets with the "tugger." [4] Giavotelia informed Baldwin that the tugger could not do the job safely and requested the use of a crane,[5] which was denied, and Giavotelia then refused to rig the sheets of metal because it was too dangerous. Baldwin had no experience as a rigger and despite this fact he took another equally inexperienced employee to the top level of the building to do this job. These two inexperienced Stoker employees tried to rig the sheets of metal with a sling attached to the cable of the tugger to lower them 120 feet for use at a 40-foot level. Encountering difficulty when they tried to lift the long corrugated sheets over the surrounding 4-foot railing because the bridle on the tie was too long to permit the tugger to raise the load over this barrier, they manually lifted and pushed the sheets over the railing. As the load dangled in the air, it became apparent it was improperly rigged; but before the mistake could be remedied, the sheets slid from the sling and fell to the ground below, striking Morgan, who was engaged in reading a blue-print near the base of the structure.
Defendants contend Morgan was guilty of contributory negligence in violating a basic safety rule known to all experienced construction workers, i. e. never stand beneath a load of material being moved. They argue Morgan with many years of experience in the construction field voluntarily exposed himself to an industrial hazard of which he is or should have been aware and that his negligence in doing so is a contributing proximate cause of the injury he sustained. In this connection they rely on this language in Romano v. Bonstaff:[6]
"The primary factor to be considered in determining whether a person was negligent is that person's own experience in the field of work he was performing at the time he was injured. * * *" 198 So.2d at 501.
While acknowledging that the issue of contributory negligence is a question of fact for the jury, nevertheless the defendants in their brief contend "* * * (1) undisputed facts established contributory negligence; (2) the jury's failure to return a verdict of contributory negligence was undoubtedly the result of the inadequate and erroneous charge on the subject by the trial court."
We agree with defendants' definition of contributory negligence and their comment as to the proper evaluation of the plea, which we quote from their brief:
"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, which is *858 that of a reasonable man under like circumstances. Smolinski v. Taulli, 276 So.2d 286 (La.App. [La.] 1973). Contributory negligence is also measured by the same standards as primary negligence. Stewart v. Gibson Products Co., 300 So.2d 870 (La.App.1974). * * *"
But these general statements of law, when applied to the facts before us, do not alter the defendants' liability. If we inquire whether Morgan's conduct was "that of a reasonable man under like circumstances," we must answer in the affirmative. No need exists to discuss the sufficiency or correctness of the jury charge on this point of law, because there is insufficient evidence in the record to support the plea of contributory negligence.
When Morgan was injured, he was in an area where his duties required him to be. He and Charles Brouillette were checking a blueprint because of a discrepancy in specifications of the fabricated pipe which had been previously connected and attached to the system. Brouillette testified at no time before the accident did he hear the tugger or know it was being operated, otherwise, he emphasized, he would not have been standing there. He explained there is always background noise on a construction job of this magnitude and oftentimes it would not be possible to hear the tugger.
This observation is verified by the fact that a safety committee, on which all subcontractors were represented, established a rule that anyone operating machinery to move materials overhead should first warn all workmen in the area that loads would be lifted or lowered. The minutes of the safety committee meeting of May 15, 1973 (some five months before the accident), state in part:
"3) The following procedure shall be followed when cranes are working in an area where other activities are being conducted. The contractor operating the crane shall assign a man to warn all craftsmen in the area when a load is about to pass overhead. After being warned, it is the responsibility of those in the danger area to move to a safe spot until the load has passed. There will be no exceptions to this procedure and neither party can shift his portion of the responsibility to the other party."
The safety committee obviously felt the noise of a crane lifting material overhead would not always be sufficient to warn workmen in the area, otherwise, there would have been no reason to adopt this rule. The Stoker crew should have been using a crane, the equipment this regulation was designed to affect. Instead they utilized the tugger, normally used for light loads. Considering the fact they were using inadequate equipment to lower the materials, it became more imperative for the Stoker crew to warn Morgan of its use.
Thus Morgan could reasonably assume the safety rule would be obeyed on the construction site and that he could safely stand near the boiler where his crew worked. Absent a warning to the contrary, Morgan should have reasonably been able to assume he was not endangered by objects being moved through the air. In addition, in view of the testimony of Brouillette, Morgan could not be expected to anticipate danger from the tugger because the basket, usually attached to it when in operation, rested on the ground several feet from him. This indicated the tugger was not being used. We therefore conclude Morgan was not negligent. Having failed to prove their affirmative defense of contributory negligence by a preponderance of the evidence,[7] defendants cannot exculpate themselves from liability.
*859 We next consider quantum. The award exceeds what we consider adequate damages by more than $1,000,000; therefore, a modification is warranted under the Gaspard[8] line of jurisprudence interpreting the "much discretion" rule of C.C. art. 1934. We would also reach the same result if we take an alternate approach and decide the case on the record under C.C.P. art. 2164, because plaintiff's counsel was permitted to unduly prejudice the jury by improper voir dire examination and/or inflammatory closing argument.
C.C.P. art. 1763[9] permits voir dire examination of jurors to ascertain their qualifications to serve. In this regard it is valid for counsel to determine whether a juror can act impartially or whether he should be disqualified because of some prejudice toward the litigants or the issues involved in the trial. But in the guise of determining whether any prospective juror had a reservation about awarding high damages, plaintiff's counsel in voir dire examination repeatedly suggested the amount of the verdict to be reached. Over objection by defense counsel, he was permitted to ask if jurors had any reservations about awarding $4 million. In addition, counsel exceeded the bounds set in C. C.P. art. 1763 by including in voir dire examination what should have been reserved for argument.
The quoted excerpts illustrate the prejudicial material permitted in the voir dire examination:
(Dealing with quantum ...)
"Mr. Wiedemann:
Assuming, gentlemen, that all of the elements of damages sustained by Mr. Morgan justify an award of Four Million Dollars in this case, do any of you personally have any reservations about making an award of that consequence, assuming that is required to fully compensate Mr. Morgan for all of the effects of the accident?"
(And ...)
"MR. WIEDEMANN:
Gentlemen, you all have heard me describe, and Mr. Baus also, the severity of the injury sustained by Mr. Morgan in this case and the disabling nature of the injuries. And assuming that those injuries and the consequence of those injuries would justify an award in the vicinity of Four Million Dollars, would each of you be able to make an award of that consequence, assuming that the evidence justifies it?"
(And again ...)
"MR. WIEDEMANN:
* * * * * *
Mr. Smith, assuming that the evidence in this case, when considered in light of the instructions that will be given to you by the court relative to the various elements of damages, would justify an award of Four Million Dollars, or thereabouts, would you have any personal conviction, or any mental reservation about awarding an award of that consequence, assuming that in your opinion the damages justify such an award from the evidence and the instructions of the court?"
(Improper use of argument on voir dire...)
"MR. WIEDEMANN:
Are each of you prepared to fully compensate Mr. Morgan for all of the humiliation and indignities that he has been required to suffer and that he will be required to suffer for the remainder of his life as it existed at the time of the *860 accident? And by `indignities', gentlemen, I mean a man who is paralyzed from the chest down and has to urinate on himself and defecate on himself; are you prepared to fully compensate him for the humiliation and indignity that precipitates for the remainder of his lifetime?"
There are two aspects of the closing argument we find inflammatory and highly prejudicial, namely, plaintiff's counsel equating defendant Stoker's negligence with criminality and his statement that the jurors would be Morgan's executioners if they did not bring back a high award. We quote:
"MR. WIEDEMANN:
* * * * * *
I think the negligence of Riley Stoker was so gross and so culpable and it borders almost on criminality, they were on this job
MR. BAUS:
Objection, if the Court please.
* * * * * *
[MR. WIEDEMANN:]
Dr. Glass wanted to let him die later on because it would have been more humane, he thought, but he is not dead and he is here. And he is here, and he is to be here and we have got to take care of him and you have got to evaluate those damages. Maybe the Lord left him here to test my ability, to convince you all maybe he left him here to determine whether or not you have the necessary charity, or the necessary good conscious [sic] to take care of him, or whether you can turn your back on him and go home and live your life knowing that you pulled the plug. Maybe that is why he left him here, I don't know, but he is here. He is here and he is helpless because Riley Stoker didn't care, they didn't care about safety. They ignored the premonitions, they ignored what they knew was going to happen, what they were told, and he is here * * *." (Emphasis supplied.)
On rebuttal, plaintiff's attorney argues:
"MR. WIEDEMANN:
Gentlemen of the jury, I now have an opportunity to make a rebuttal argument to you and I will make it as brief as possible in the time limit that I can do justice to my client, at least. It appears, after five days we have at least come to the common understanding and apparently we are only talking about money, which I guess is some accomplishment after five days. But it never ceases to amaze me in practicing law for twenty years, what an insurance company will suggest that you do as citizens to an injured man and this, I believe, is probably the most injured that I have ever been involved in in twenty years, which I am referring to Mr. Morgan because I speak for him since he is unable to speak for himself.
* * * * * *
"Now, they say there is no criminal act, I guess there is no criminal act, but they are asking you to commit a criminal act, they are asking you to execute this man * * *."
(Emphasis added.)
Because the Louisiana constitution requires appellate courts to review both facts and law,[10] there has been little jurisprudence defining what constitutes proper argument to a civil jury. But in a recent case, Temple v. Liberty Mutual Insurance Company,[11] the court pointed out that a fair trial can only be afforded all litigants if the juror is not subjected to prejudicial argument. The decision observed:
"* * * We are of the view that a civil jury can properly perform its function *861 of damages assessment when it weighs the facts of a case in the light of proper argument which allows the finder of fact the opportunity to reach its decisions dispassionately and with due regard for the rights of all concerned." 316 So.2d at 794.
Rather than remanding this case for a new trial, which would further delay compensating John Morgan for the serious injuries he suffered, we will assess damages based on the evidence before us. At the outset we reiterate the observation made in the case of York v. Sedotal, 281 So.2d 170, 172 (La.App. 4th Cir. 1973):
"* * * As is usually encountered, the verdict merely sets forth the aggregate amount of the award. It does not detail either the nature of the damages recognized or the particular sums assessed. To ascertain the reasonableness of the total amount awarded, we must separately consider and evaluate the following compensable elements of damages allegedly sustained: (1) injuries, pain and suffering (past and future); (2) past and future medical expenses; (3) loss of income; and (4) loss of future earnings."
We itemize our award of the elements of damage we have considered:

Loss of wages to date of trial $ 21,958.02
Loss of future wages 168,102.38
Medical expense
 (to reimburse compensation carrier) 100,000.00
Future medical 837,305.32
Pain, suffering and disability 300,000.00
 ____________
 $1,427,365.72

There is no dispute on the first and third items of damage.

PAIN, SUFFERING AND RESIDUAL DISABILITY
The residual disability John Morgan suffered as a result of this industrial accident is staggering; he has been transformed from an active outgoing father and husband to a brain damaged, bed-ridden invalid. He frequently displays hostility to his wife and children that, medical evidence indicates, stems from pain he often suffers and depression resulting from the realization that he will be an invalid for the rest of his life. Frequently his brain damaged condition prevents him from engaging in lucid conversations with his wife and children. Physically he is paralyzed from the chest down, and he is confined to bed, though at times he may be placed in a wheel chair. He is unable to control bodily elimination and must always be assisted by either the nurse attending him or a family member. He is unable to engage in sex relations with his wife. His daily maintenance requires medication pumped directly into the lungs by an intermittent positive pressure breathing machine through a permanent tracheotomy and suctioning of lung secretions through the throat opening. Nightly, warm, moist air is pumped through the tracheotomy to keep the airway open. Nurses turn him constantly to prevent development of bed sores and pneumonia.
For this, plaintiff argues, general damages should be very highpresumably in the million dollar category. Plaintiff claims John Morgan has "* * * the worst injury case in the annals of Louisiana law." Actually the injuries are markedly similar to those suffered by Steven Trahan in Trahan v. Girard Plumbing & Sprinkler Co.,[12] wherein we awarded $200,000 in general damages. Although Trahan was a younger man (in his late twenties) than John Morgan when he was injured, we are convinced from the evidence Morgan is experiencing more intense pain and suffering.
Considering the evidence before us that establishes, inter alia, John Morgan is expected to live 17.4 years in the unimproved condition we have described, we are of the opinion that the sum of $300,000 in general *862 damages should be awarded for these injuries, pain and residual disability.
Plaintiff relies on Cacibauda v. Gaiennie,[13] as authority for million dollar general damages, pointing out that this court affirmed an award of $58,726.93 for 15 days of pain and suffering. That decision is not authority for the proposition that severe injuries deserve inflationary general damages; it simply illustrates an application of the Gaspard rule. In affirming a high pain and suffering award we noted that the amount was higher than what we would have awarded, but did not constitute an abuse of the "great discretion" vested in the trial judge and/or jury. In that same case the jury awarded low damages to the surviving children for loss of love and affection they suffered when their father died. We pointed out that Gaspard prevented our raising what we considered inadequate compensation to the children just as it prevented our decreasing the pain and suffering award for the 15 days the injured workman survived the industrial accident.

LOSS OF FUTURE WAGES
We computed the $168,102.38 award from the earning and life expectancy data in evidence and disregarded as speculative the $187,000-plus figure suggested by one actuary and $240,200 by the other. We note at this point it would have been helpful to have expert actuarial testimony to make these projections on nonspeculative factors.
In computing this item of damage we want to furnish Morgan with a minimum. $19,000 per annum for the remainder of his 9.2 years' work life expectancy. In the last full year he worked (1972), he reported a $19,622.35 gross income from wages, which we have rounded off to $19,000. In awarding loss of future wages, our courts have the option of using the gross income, the net income, or any figure in between that was reported by the injured on his last tax return, representing his latest statement of his wages. In Edwards v. Sims,[14] this court made the following observation:
"The fact that damages resulting from personal injuries are not subject to income taxation (26 U.S.C. § 104) is interrelated with the question of whether the previous earnings factor should be based on wages before or wages after taxes.5
[N]5. Some decisions have indicated gross wages should be considered. See, for example Menard v. Travelers Ins. Co., 240 So. 2d 390 (La.App. 3rd Cir. 1970), and Duplechin v. Pittsburg Plate Glass Co., 265 So. 2d 787 (La.App.1972), citing Adams v. Allstate Ins. Co., 212 So.2d 204 (La.App. 4th Cir., 1968), cert. den. 252 La. 888, 214 So.2d 716. However, in the Adams case, the loss of wages was stipulated and not at issue; the court simply used the words `total gross pay loss was $424.' 294 So.2d at 616-17.
Any consideration of damages for loss of wages (past or future) should be based on net income after taxes, since a plaintiff's gross earnings before taxes are never truly available to him. * * *"
Because tax liability varies with the individual and is altered with changing circumstances, in some cases it is more appropriate to project future lost earnings on a figure near the gross income. In Morgan's case, it is obvious his future tax liability will not be comparable to the $3,000-plus figure he paid in 1972 because his circumstances have been radically altered. While the damages he is awarded are not taxable, the income derived from their investment is. In all probability his medical expenses will create a deduction sufficient to relieve him of any tax liability.
Considering these factors we use a $19,000 per annum base. We accept an actuarial projection of inflation at 3.8 percent per year and use a 4.8 percent investment yield in making our computation. For each $1,000 present value dollars to be paid for 9.2 years (with inflation at 3.8 *863 percent), $8,847.49 is needed. This contemplates paying the first $1,000 in advance and leaving a balance of $7,847.49 to invest at 4.8 percent. A lump sum of $168,102.38 is awarded to produce this yield.
The Supreme Court has admonished against the use of precise mathematical calculations based upon life expectancy to set the loss of future wages.[16] However, our award makes allowance for the adjustments we deem necessary to adequately compensate for the loss of future wages.
Stated another way, the award of damages for loss of future wages projected over the period of disability or life expectancy is discounted or adjusted by a reasonable rate of return which could be realized from its conservative investment based upon prevailing market conditions at the time of its award. This adjustment is necessary because the prepayment of this particular anticipated damage for 9.2 years is made immediately upon the finality of judgment, whereas in fact the right to such wages would normally accrue or be payable in successive years in the future over a like period of time.

FUTURE MEDICAL EXPENSE
It is not disputed that John Morgan requires nursing service at home for 22 of the 24 hours each day. After his initial hospitalization at East Jefferson General Hospital for approximately six months, he was admitted to the Texas Institute for Rehabilitation and Research and was discharged in July 1973 when it was determined he could derive no further benefit. Since that time he has been at home and has received excellent nursing care (all the medical experts agreed). The cost averages $920 per week, but all litigants agree to a projection of $52,000 per year for nursing expense. There is no attempt to establish cost of future doctor or hospital expenses (and perhaps this is not susceptible of proof). With regard to the projected cost of lifetime nursing service, we again reject the actuaries' figures as unrealistic because they are based on speculative assumptions.
In determining this award should be $837,305.32, we use the same approach as we did in computing loss of future wages. We think the record warrants our providing John Morgan with $52,000 per year for medical expenses for his 17.4 years' life expectancy. If this sum is invested at 4.8 percent and allowance is made for a 3.8 percent per annum inflation factor, the principal and interest will provide $52,000 present value dollars each year for life.
For the reasons assigned the judgment appealed from is affirmed insofar as it casts Riley Stoker and Liberty Mutual Insurance Company in judgment for $1,000,000 and is amended to reduce the award to plaintiff against Riley Stoker and American Home Assurance Company from $1,481,000 to $427,365.72 and is further amended so that out of said sum intervenors Peter Kiewit Sons' Company and Home Indemnity Company are awarded the sum of $3,965 in weekly compensation benefits and $100,000 in medical expenses paid to plaintiff on behalf of and/or for the account of John Morgan.
Defendant Liberty Mutual Insurance Company is to pay the cost of this appeal.
Amended and affirmed.
REDMANN, Judge (concurring).
The judgment in this case should: first, award the past medical expense and lost earnings; second, award perhaps $25,000 to $50,000 general damages (rather than $300,000); third, declare the alimony-like obligation of defendant insurers to provide, during the incompetent Morgan's lifetime, future medical expense (whatever its reasonable *864 cost) and earnings-equivalent; and fourth, under the special circumstances of this case, overtly award reasonable attorney's fees.
I therefore concur in the reduction of the judgment appealed from, although I would, in effect, reduce it more as to general damages and probably (because Morgan will not likely last an average life expectancy) as to future lost earnings and medical expense.

General Damages
Even $300,000 is excessive for pain, suffering and disability because both (a) Morgan has little pain and suffering or even awareness of his dire condition and (b) Morgan is incapable of enjoying money, either to spend or to save or to give away.
Perhaps both points can be dismissed as a factual disagreement: on the facts found by the majority, the result may be correct. But the factual disagreement is not absolute: Morgan is admittedly incompetent, mentally and physically. At least point (b) deserves discussion.
The theory of money-to-repair fits precisely in items of pecuniary damages: the price of repairing the car or of the medical services, or the amount of the lost wages, is money and money can in fact repair those items of damage. But money cannot repair pain, or loss of limb, or anguish: those items cannot be repaired or restored at all, and the tortfeasor's obligation "to repair" must be theorized as "to make reparation" or amends. The unreversible displeasure of pain and suffering can be alleviated or overcome by the pleasure of things money can bring: the price of a new television may make amends for modest pain, a new automobile for greater pain, a new house or the security of substantial money in the bank for yet greater pain.
This theory of money-as-reparation, however, requires for its validity a victim who can benefit from the reparation. A dead victim cannot be consoled; the dead are incapable of enjoying money's pleasure as a surrogate for life. If the permanent state of a victim is such that he cannot appreciate having money nor enjoy the things it can buy, then money cannot constitute a reparation, cannot make amends, for the nonpecuniary damage he has suffered.
"Though it is irrelevant what a plaintiff does with the damages awarded to him it should not be irrelevant that he is not capable of doing anything with them. It is surely not the policy of the law to give a windfall to the next-of-kin where insurance spreads the load of damages and thus increases the general cost of services to the community." Note, 1962, 25 Modern L.Rev. 479, 481.[1]
The ultimate question is whether the obligation to pay general damages is reparation or punishment. In Louisiana, C.C. 2315 answers that the obligation is "to repair."

*865 Future Medical Expense

The grave problem with lump-sum future medical expense in this case is that it may run out before the victim's life does. Thus the lump-sum judgment does not enforce the tortfeasor's obligation "to repair." Yet our deficiency in clairvoyance does not insure harm only to the victim: his life, unfortunately and regrettably, may well run out long before the lump-sum does, leaving a windfall to his heirs far beyond the tortfeasor's obligation. The vagaries of inflation or recession may also unpredictably alter the lump-sum's commensurateness with the obligation.
In the similar case of Oliver v. Ashman, 1961, 3 All E.R. 323, Lord Justice Willmer noted the difficulty and suggested "in exceptional cases ... a provisional award, with power to adjust it hereafter in the light of the circumstances as they in fact develop."
Our experience in workmen's compensation medical benefits shows that continuing and adjustable payments can be ordered by the courts and, typically, managed by the litigants without the necessity of recourse to the available judicial review of the reasonableness of later expenses.
If future medical expenses are to be so compensated, future earnings loss can also more exactly be compensated by awaiting the future.
This is an exceptional case. It merits an exceptional decree.

Attorney's Fees
This exceptional case also requires that we allow attorney's fees (perhaps remanding for their fixing after a hearing). In the ordinary case, the general damages may suffice to pay the attorney, or the victim's own earnings (or damages for loss of earnings) may. Here, the great bulk of the total award (lump-sum or not) is for medical expenses indispensable to life. It is true in every case that the tort causes the hiring of the lawyer, and nevertheless the rule is that the lawyer's fees are not recoverable: but here we cannot rationalize that result, and we cannot furtively ignore that rule by awarding large general damages. Research has not disclosed a Louisiana case of this exceptional character in which the question of attorney's fees has been discussed. We should afford the "adequate remedy" that La.Const. art. 1 § 22 commands.
Before REDMANN, STOULIG and GULOTTA, JJ.
PER CURIAM.
The applications for rehearing filed by Mrs. Mary Cavanaugh Morgan; by Riley Stoker Corporation; by Liberty Mutual Insurance Company; and by American Home Insurance Company are refused.
The application of Peter Kiewit Sons' Company and Home Indemnity Company, intervenors, points out the original decree failed to fully reimburse them for medical expenses and workmen's compensation benefits they paid plaintiff under the Workmen's Compensation Act. While this appeal was pending intervenors continued to honor their obligation by paying for plaintiff's medical expenses and his compensation benefits. The amounts stipulated at the trial as being due are no longer accurate. In order that there would be a basis in the record to support a judgment for the amount actually due, plaintiff and intervenors have filed a joint stipulation setting forth the correct amounts.
Accordingly, with respect to the intervenors, our original decree is recalled and it is now ordered there be judgment in favor of Peter Kiewit Sons' Company and Home Indemnity Company for the $125,000 in medical expenses advanced and for $7,475 in compensation benefits paid to date. It is further ordered intervenors shall be reimbursed for whatever future weekly compensation benefits are paid until *866 this judgment is satisfied. Intervenors are to be paid by preference out of any judgment rendered in plaintiff's favor.
Rehearings refused; original decree amended and reinstated, as amended.
NOTES
[1] Appearing through his wife and curatrix, Mary C. Morgan.
[2] Originally, plaintiff sued the corporate officers and employees of several firms involved in the construction project, but later voluntarily dismissed them as defendants.
[3] Each sheet measured 2 ½ feet by 20 feet and weighed 150 pounds.
[4] The "tugger" or "chugger" (named for the noise made by the compressed air passing through its cylinders when in operation) is positioned on the ground and is connected to a boom or ginpole on the top of the structure by cables run through a series of shields and blocks. It is designed to vertically lift light loads, such as water, hoses, welding equipment, etc., that are placed in a basket usually attached to the end of the cable.
[5] A crane had been used to hoist the metal to the top level of the building.
[6] 198 So.2d 499 (La.App.4th Cir. 1967).
[7] C.C.P. art. 1005; New Amsterdam Casualty Company v. Culotta, 230 So.2d 339 (La.App. 4th Cir. 1970).
[8] Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
[9] "The court shall permit the parties or their attorneys to conduct the examination of a prospective juror and may itself conduct an examination, which shall be limited to ascertaining the qualifications of the juror."
[10] LSA-Const.1921, Art. 7, § 29; LSA-Const. 1974, Art. 5, § 10(B).
[11] 316 So.2d 783 (La.App. 1st Cir. 1975).
[12] 299 So.2d 835 (La.App. 4th Cir. 1974).
[13] 305 So.2d 572 (La.App. 4th Cir. 1974).
[14] 294 So.2d 611 (La.App. 4th Cir. 1974).
[16] McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961); York v. Sedotal, 281 So.2d 170 (La.App. 4th Cir. 1973).
[1] The cited Note reviews Wise v. Kaye, 1962, 1 All E.R. 257. Compare Helms v. United States, D.C., 1964, 231 F.Supp. 961, 964: "In regard to amount of damages awarded to Plaintiff for pain and suffering, it must be given consideration that though it is unquestionable that [plaintiff's incompetent] undergoes terrific pain, the fact is that he is neither now nor will he ever be, a rational, thinking individual. His lack of comprehension, though not total, does considerably diminish the mental suffering to which he is subjected. To suffer, and be truly and rationally cognizant of that suffering, is inestimably worse, and so the Court in its award of damages must take into account the true situation, and for that reason have awarded only $10,000.00 in damages." See also Comment, Nonpecuniary Damages for Comatose Tort Victims, 1973, 61 Georgetown L.J. 1547; Note [on Oliver v. Ashman, 1961, 3 All E.R. 323], 1962, 25 Modern L.Rev. 108; Note [on Wise], 1962 Camb.L.J. 153; Nygh, "Is it Cheaper to Kill than to Maim?" 1962, 3 Australian Lawyer 33; Munkman, "Personal Injuries to a Living Plaintiff" (reviewing H. West & Son, Ltd. v. Shephard, 1963, 2 All E.R. 625), 1963, 113 Law J. 542.