332 So.2d 303 (1976)
Carolyn Ann ROBINSON and Frank J. Tornabene
v.
Robert GRAVES, Jr. and New Orleans Public Service, Inc.
No. 7406.
Court of Appeal of Louisiana, Fourth Circuit.
May 18, 1976.
Rehearing Denied June 9, 1976.
Writ Granted September 24, 1976.
*304 Leydecker, Bates & Hand, Gerald J. Leydecker, New Orleans, for plaintiff-appellee, Carolyn Ann Robinson.
C. B. Ogden, II, New Orleans, for defendants-appellants.
Before REDMANN, GULOTTA and STOULIG, JJ.
GULOTTA, Judge.
We are confronted with the sole issue of quantum. Defendants complain that an award in the sum of $159,532.00 in favor of Carolyn Ann Robinson Brown is excessive. We amend the award to $110,172.18.
It is defendants' contention that in an October 16, 1971 automobile accident, plaintiff (hereinafter referred to as Mrs. Robinson), a guest passenger in a taxicab rearended by a streetcar, suffered a fractured transverse process at the fourth lumbar vertebra which admittedly was slow to heal. According to defendants, approximately nine months after the accident, Mrs. Robinson was discharged by her treating physician as cured.
Defendants contend that the award for general damages, loss of past earnings and loss of future earnings is excessive and based primarily upon the diagnosis and testimony of Dr. Salvador Henry LaRocca, an orthopedist, who testified that plaintiff suffered degenerative intervertebral disc disease, requiring fusion of L-4, L-5 and S-1 in February, 1973, and a disc excision at L-5, S-1 in April, 1974, resulting in a 35% disability of the body which prevented plaintiff from resuming her preinjury employment. According to defendants, the testimony of Dr. LaRocca was disputed by the overwhelming medical expert evidence of Drs. Joseph Dugas and William Pusateri, plaintiff's treating physicians, as well as that of Dr. Richard Levy, a neurosurgeon, and Dr. Ray J. Haddad, an orthopedic surgeon. Defendants claim the treating physician did not find degenerative disc disease. They point out also that Drs. Levy and Haddad testified that the February, 1973 operative notes of Dr. LaRocca did not indicate any signs of degenerative disc disease. Furthermore, according to defendants, the positive testimony of Drs. Levy and Haddad refutes any connection between the accident of October, 1971, and the finding of a ruptured or incompetent disc in April 1974.
It is clear from the written reasons assigned by the trial judge, in which the damages *305 were itemized,[1] that the trial judge rejected defendants' contentions. The record supports the court's conclusion.
Plaintiff was seen by Dr. Dugas on October 18, 1971, with complaints of chest, lower back pain and hip pain, radiating into the left lower extremity. Examination indicated tenderness and spasm of the left paravertebral musculature, indicative of a sprain of the lower spine. X-rays revealed a fracture of the right transverse process of L-4, without significant displacement of the fragments. Muscle relaxants, analgesics and diathermy were prescribed. Between October 22, 1971 and November 13, 1972, Mrs. Robinson was either seen by Dr. Dugas or administered physiotherapy on 27 occasions. During this time, plaintiff complained of persistent back pain and of not being able to do any housework. On November 13, 1972, plaintiff was advised by Dr. Dugas to seek orthopedic consultation. It was Dr. Dugas's opinion that the degenerative disc disease, noted by Dr. LaRocca, could have been caused by the trauma sustained from the accident.
As early as October 25, 1971, plaintiff was seen by Dr. William M. Pusateri. Dr. Pusateri confirmed Dr. Dugas's diagnosis of a fracture of the right transverse process of the fourth lumbar vertebra. Bed rest and a lumbar corset were prescribed. Because of intermittent pain, plaintiff visited Dr. Pusateri on six occasions between November 8, 1971 and May 26, 1972. According to Dr. Pusateri, the continued complaint of pain in the back, left hip and left leg were consistent with a strain of the lumbar musculature. Dr. Pusateri further explained that complaint of inability to sit for long periods of time was consistent with disc pathology in the lumbar spine. It was the doctor's opinion that the intermittent pain suffered by plaintiff was compatible with a protruding disc, but not necessarily with a ruptured disc. However, Dr. Pusateri indicated that plaintiff had completely recovered, in his opinion, and would have no disability referrable to the injury. According to the doctor, the LaRocca operative report of February 15 indicated that a loose piece of cartilage which had been separated from the main mass had been removed, but that the operative report did not confirm the presence of intervertebral disc degeneration at L-4, L-5.
Dr. Salvador LaRocca initially saw plaintiff on January 9, 1973. Because of continued symptoms from the time of the accident, plaintiff was admitted to Touro Infirmary for examination and tests on February 12, 1973. A myelogram was normal, but a discogram caused plaintiff pain and, according to Dr. LaRocca, the discogram was abnormal. Surgical removal of a loose fragmented body (osteochondral consisting of bone and cartilage) at L-4, L-5 and fusion of L-4, L-5 and S-1 was performed on February 15, 1973. Dr. LaRocca found degenerative disc disease at L-4, L-5 and L-5, S-1. Mrs. Robinson was discharged from the hospital on February 28, 1973. Following *306 the operation, plaintiff's activities were restricted and a brace was used. Medication was prescribed. Plaintiff was seen postoperatively by Dr. LaRocca on two occasions in July, 1973. A return visit in October, 1973, indicated soreness in the area of the pelvis from which a bone graft was taken. Plaintiff was again seen on December 4, 1973 and on January 31, 1974. On March 25, 1974, plaintiff was readmitted to the hospital with complaints of substantial back pain and pain radiating into the right lower extremity. An operation on April 11 revealed a bulge of the intervertebral disc at the fifth segment, requiring removal at L-5, S-1. On April 25, 1974, Mrs. Robinson was discharged from the hospital. She was seen postoperatively by Dr. LaRocca on eight occasions between May 22, 1974 and January, 1975.
According to Dr. LaRocca, it will be necessary that plaintiff modify her lifestyle in order to accommodate her back condition. The doctor indicated that a year to a year-and-a-half would be required for full recovery. Work requiring bending or lifting and activities involving prolonged sitting or prolonged riding in an automobile were prohibited. According to Dr. LaRocca, only approximately 50% of cases similar to that of Mrs. Robinson's have resulted in a complete remission of symptoms. The doctor assessed a disability of 35% impairment of the body as a "whole". According to Dr. LaRocca, this assessment is subject to revision based on hopeful improvement, however, plaintiff would continue to have some measure of permanent disability. It was the doctor's opinion that the fracture of the right transverse process, the fragmented loose body, operatively removed, the degenerative disc disease, requiring fusion, and ultimate disc removal, as well as the resultant disability suffered by plaintiff was caused by and was attributable to the accident.
According to Dr. Richard Levy, a neurosurgeon, examination of reports of Drs. Dugas and Pusateri did not indicate any degenerative disc disease or impairment. Dr. Levy further pointed out that the April 5, 1973 postoperative report of Dr. LaRocca was inconsistent with the February, 1973 operative report. According to Dr. Levy, the April report indicated that exploration confirmed the presence of intervertebral disc degeneration at L-4, L-5 and L-5, S-1, while the February report merely indicated that only the L-5, S-1 interspace had been inspected and did not indicate any disc degeneration or disease.[2] Dr. Levy further testified that the operative report indicated to him that L-5, S-1 was normal. The doctor further explained that the hospital report did not indicate that Dr. LaRocca inspected L-4, L-5.
It was Dr. Levy's opinion that the October, 1971 accident could not have caused the disc protrusion in March, 1974. Dr. Levy, however, acknowledged that he did not examine plaintiff and, therefore, could not definitely state that the ruptured disc was not precipitated by the October, 1971 accident. Dr. Ray J. Haddad, an orthopedic surgeon, substantially corroborated the testimony of Dr. Levy. Dr. Haddad also did not examine plaintiff, but testified from information obtained from reports of the treating physicians and Dr. LaRocca.
We are not in agreement with defendants' contention that Drs. Levy, Haddad, Dugas and Pusateri contradicted the testimony of Dr. LaRocca. Drs. Levy and Haddad did not state that plaintiff did not suffer from a degenerative intervertebral disc disease. Dr. Levy's testimony was to the effect that the postoperative notes of the February fusion operation by Dr. LaRocca did not indicate a degenerative intervertebral disc disease. He did indicate that the postoperative notes of April 5, 1974 indicated *307 the presence of disc disease. So much for the medical testimony.
Carolyn Robinson testified that prior to the accident, she had not suffered any back trouble. Her postaccident symptoms and treatment substantially corroborated the testimony of Drs. Dugas, Pusateri and LaRocca. On January 15, 1972, Mrs. Robinson returned to her preaccident employment at Barnett's Furniture Company, where she had been employed as an assistant credit manager. She stated that when she returned to work, she was not without pain, but was required to work in order to support herself and her two minor children. In January, 1972, her earnings were $425.00 per month. Her pay was increased to $500.00 per month in May, 1972. In February, 1973, she discontinued her employment. Mrs. Brown stated that for approximately 10 months after her first operation, she was in constant pain, unable to sit without experiencing pain, unable to put shoes on by herself or to get out of bed "normally". According to plaintiff, she attempted to do part-time work in June, 1973, and again in November, 1973. She worked as a waitress from November, 1973, until February or March, 1974. This employment was discontinued because of intense pain suffered by her.
Peter Bondy, an actuary, computed plaintiff's loss of earnings between October 16, 1971 and January 1, 1972, based on earnings of $475.81 per month, at $1,189.53. From March 1, 1973 through December 11, 1974, plaintiff's loss of earnings, computed at $500.00 per month, totalled $10,750.00. Based on the likelihood that plaintiff could not return to work before June 11, 1975, and using an income figure of $600.00 per month, the actuary computed a $3,600.00 loss of income from December 1, 1974 to June 11, 1975. According to the actuary, a 6% interest adjustment reduces this figure to $3,556.69.[3]
In connection with future loss of earnings, plaintiff testified that since the second operation (April, 1974), she has been unable to return to any type of gainful employment. Mrs. Robinson stated further that she was unable to do housework of any kind. As previously indicated, Dr. LaRocca assessed plaintiff's disability at 35% impairment of the body as a "whole", some measure of which would be permanent. Sara Nunez, president of an employment service, stated that plaintiff would not pass the physical examination of any company and that the only type of position where plaintiff could be placed offered an average earning of approximately $2.00 per hour.
The actuary based his computations for future loss of earnings on the assumption that if plaintiff had not sustained the injuries, she would have returned to her preinjury employment at Barnett's with monthly earnings in the sum of $700.00. Because of her inability to resume her occupation, he computed her postaccident earning capacity at $2.10 per hour. Based on this hourly rate, the actuary computed plaintiff's future monthly earning potential at $362.72. The difference between the $700.00 figure and the $362.72 monthly earning potential figure amounted to a monthly future loss in the sum of $336.28. According to the actuary, Mrs. Robinson, 30 years of age at the time of trial, had a work-life expectancy of 32.66 years. After taking into consideration a 6% interest discount rate and a 3% inflation rate, the actuary computed a total loss of future earnings in the sum of $82,220.36.
The actuary's calculation as to plaintiff's future loss of earnings was partially based on the fact that plaintiff would have returned to her preinjury employment at Barnett's at a salary of $700.00 per month. However, the record contains no evidence that plaintiff would have returned at the $700.00 salary level. Although the credit manager at Barnett's testified that plaintiff was being trained for the position *308 of credit manager with a monthly salary of $800.00, plaintiff did not assume this position. Loss of earnings testimony based on the possibility that plaintiff would become credit manager at some time in the future at $700.00 or $800.00 per month is speculative. However, Bondy, the actuary, did testify that if the $500.00 per month salary figure was used, with a 6% discount and a 3% inflation rate, plaintiff's total loss of future earnings would amount to $33,240.18. This figure is more realistic.
Accordingly, the trial court award of $82,000.00 for loss of future earnings must be reduced to the sum of $33,240.18.[4]
In addition, since Bondy erroneously used a $600.00, rather than $500.00, per month salary figure in computing plaintiff's past loss of earnings between December 11, 1975 and June 11, 1975, it is necessary that Bondy's computations be reduced to the extent of $100.00 per month for a six-month period. Therefore, plaintiff's award for past loss of earnings during this period must be reduced to $2,956.69.
It is clear from the record that in deciding for plaintiff, the trial judge placed more reliance on the testimony of Dr. LaRocca than on Drs. Levy and Haddad. The rule is well settled that when the record contains evidence which furnishes a reasonable factual basis for the trial court's finding, on review, the appellate court will not disturb those factual findings in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La. 1973). We cannot say the trial judge erred in the instant case. Accordingly, we conclude the general damage award in the sum of $50,000.00, under the circumstances, is not excessive. However, because part of loss of past earnings and loss of future earnings were based on an erroneous contemplated pay scale, the trial court's award for loss of earnings from December 1, 1974 to January 11, 1975 is reduced from $3,556.69 to $2,956.69. The future loss of earnings award is reduced from $82,000.00 to $33,240.18. Accordingly, the judgment of the trial court is reduced from $159,532.00 to $110,172.18.[5] As amended, the judgment is affirmed.
AMENDED AND AFFIRMED,
NOTES
[1] "Plaintiff Carolyn Brown's proven damages are itemized as follows:

Dr. Wm. Pusateri 63.00
Roslyn Lacombe (maid
 service) 2143.00
Dr. Joseph Dugas 425.00
Dr. Hunt et al, x-rays (3
 times) 115.00
Dr. S. H. LaRocca ($1565
 & 975.00) 2540.00
Dr. Whitecloud 340.00
Dr. C. M. Nice (x-rays) 89.00
Drug bills $ 425.00
Hospital bills ($2621.25 &
 3016.00) 5637.25
Back corset (Dr. Pusateri) 48.78
Back brace (Dr. LaRocca) 99.75
Dr. Martin 80.00
Ambulance 30.00
Loss of wages 10/16/71-12/11/74 11939.53
Loss of wages 12/11/74-6/11/75 3556.69
Loss future wages (discounted) 82000.00
Pain, suffering, worry, inconvenience,
 etc., two major
 operations with removal
 of ruptured discs
 and fusion of spine 50000.00
 ___________
 TOTAL $159,532.00

[2] Dr. LaRocca testified that the hospital records are not complete and do not set forth in every respect what transpired during the operation. According to Dr. LaRocca, his postoperative office notes supplemented the operative report.
[3] This figure is subject to a further reduction of $600.00 and is covered later in the opinion.
[4] In Morgan v. Liberty Mutual Insurance Company, 323 So.2d 855 (La.App.4th Cir. 1975), this court accepted a 3.8% inflation rate and a 4.8% investment yield in computing plaintiff's loss of future wages. However, the 6% discount rate and the 3% inflation rate used in the instant case are the only rates established by the evidence in this record.
[5] The amount of the reduction is computed by adding the difference between $3,556.69 and $2,956.69, i.e., $600.00, and the difference between $82,000.00 and $33,240.18, i.e., $48,759.82. The total amount of the reduction is $49,359.82, which we subtracted from $159,532.00.