381 So.2d 1312 (1980)
Hilda FACIANE
v.
Janice CARTER, New Orleans Public Service, Inc., and Southeastern Fidelity Insurance Company.
No. 10861.
Court of Appeal of Louisiana, Fourth Circuit.
March 11, 1980.
Darleen M. Jacobs, New Orleans, for plaintiff-appellee.
A. R. Christovich, Jr., New Orleans, for defendants-appellants.
Nelson, Nelson & Lombard, Ltd., Irving H. Koch, New Orleans, for defendant-appellant Southeastern Fidelity Ins. Co.
Before GULOTTA, SCHOTT and GARRISON, JJ.
GULOTTA, Judge.
In this personal injury suit arising out of an accident between an automobile and a *1313 New Orleans Public Service, Inc. bus, the trial judge awarded a judgment in favor of the plaintiff-automobile passenger for the following amounts:

Past pain and suffering ........ $ 50,000.00
Future pain and suffering ...... 100,000.00
Past lost income & benefits .... 16,332.34
Diminished earning capacity &
 loss of retirement benefits ... 50,000.00
Medical expenses ............... 18,988.16
 ___________
 TOTAL..................... $235,320.50

Based on an apparent finding of concurrent negligence, New Orleans Public Service, Inc. and Southeastern Fidelity Insurance Company (the liability insurer for the driver of the automobile) were cast in judgment in solido, subject to Southeastern's liability limit of $5,000.00.
New Orleans Public Service, Inc. (NOPSI), appealing, claims the trial judge erred in finding negligence on the part of the bus driver. Alternatively, NOPSI complains the award is excessive. In a cross-appeal, plaintiff complains of the inadequacy of the award.[1]
Between 6:00 and 6:30 p. m. on April 7, 1977, plaintiff was riding in the right-front seat of an automobile owned by her but being driven by Carleen Jacobs in a westerly direction on Chef Menteur Highway. The NOPSI bus was also traveling on this highway in a westerly direction. The highway, as it approaches the Industrial Canal bridge, has three westerly traffic lanes and three easterly traffic lanes, separated by a median. The three lanes merge into two lanes in each direction crossing the bridge. The automobile was traveling in the left traffic lane. The bus, traveling in the extreme right traffic lane, was merging left in order to cross the bridge in the right lane of the two bridge-traffic lanes. While crossing the bridge, the left front bumper of the bus struck the middle of the right door of the automobile, apparently near where plaintiff was seated. The automobile damage amounted to $280.16. Of the three occupants of the automobile, only plaintiff was injured.[2]
According to plaintiff's version of the accident, as the automobile was entering the bridge, the bus driver, attempting to merge left while approaching the bridge, crossed over into and invaded the automobile's lane of traffic, thereby striking the right door of the vehicle. Plaintiff's version is supported by her own testimony and by that of the driver and the other passenger of the automobile. According to defendant NOPSI's version of the accident, as stated by the bus driver, when the two vehicles reached the middle of the bridge the bus was traveling in the right lane of the two bridge-traffic lanes. The driver testified the automobile (traveling in the left traffic lane) in an attempt to avoid heavy traffic traveling in the opposite direction, came into and invaded the bus lane of traffic, striking the left front bumper of the bus.
The bus driver had been employed by Public Service for approximately five weeks at the time of the accident. A trainee, she was accompanied on the route by her trainer, who was sitting directly behind her when the accident occurred. Although the bus driver testified, the trainer did not. Unexplained is whether there were passengers on the bus at the time of the accident or whether the trainer was unavailable to testify. When we consider the testimony of the automobile driver and its occupants, together with the testimony of the bus driver, as well as the physical surroundings of the merger to the left of the three traffic lanes into two, we are led to conclude it is more probable than not that the Public Service bus invaded the automobile's lane of traffic. We find no manifest error in the judgment in favor of the plaintiff and against New Orleans Public Service, Inc.

*1314 QUANTUM
At the outset, NOPSI makes no claim that the medical expenses in the sum of $18,988.16 were erroneously awarded. Nor is it seriously contended that the award for past lost income and benefits, in the sum of $16,332.34, is an abuse of the trial court's discretion. Suffice it to say that Lilly Mae Jarrell, who is responsible for the payroll and payroll records at Southeast Memorial Hospital (where plaintiff had been employed at the time of the accident), testified that plaintiff's lost wages and benefits total $16,332.34. An economist witness computed the total lost wages, health insurance and life insurance benefits up to the date of the trial at $15,180.04. We cannot say the trial judge erred when he accepted the lost wages and benefits as determined by the representative from the hospital, plaintiff's employer.
The primary thrust of NOPSI's attack on quantum is at the $50,000.00 award for past pain and suffering, the $100,000.00 award for future pain and suffering, and the $50,000.00 award for diminished earning capacity and loss of retirement benefits.
DIMINISHED EARNING CAPACITY AND LOSS OF RETIREMENT BENEFITS
At the time of the accident in which she suffered neck and back injury (hereinafter more fully discussed) plaintiff was fifty-four years of age. She had been employed by Southeast Memorial Hospital for thirteen and one-half years. According to Lilly Jarrell, the personnel record keeper at the hospital, Hilda Faciane would have been eligible for a $327.61 monthly pension after she had completed fifteen years of service. In addition, she would have received life insurance benefits and hospitalization, along with the pension, for the remainder of her life.
Plaintiff was employed at the hospital from March 2, 1964 until July 14, 1975 as an attendant responsible for the care of mental patients. Her duties included lifting patients when necessary. In July 1975 she was promoted to a psychiatric attendant, which involved administering medication to the patients and accompanying the patients off the hospital grounds. This job also required lifting, pulling and pushing her patients, particularly when they became violent. Some overhead arm movement was also necessary. Subsequent to her injury, Mrs. Faciane was tranferred to the job of a beautician; however, because of a neck brace, pain and restriction of movement resulting from the injury sustained in the accident, she was not able to continue with her employment. Plaintiff was paid through September 8, 1977 and was granted a leave without pay from September 8, 1977 until her termination of employment on December 28, 1977. Because of her loss of employment at the hospital caused by the injuries sustained in the accident, plaintiff was deprived one and one-half years short of qualifying for a fifteen-year pension.
Mrs. Faciane underwent surgery on two different occasions, the first for removal of two cervical discs and a fusion and the second for decompression of a compressed nerve caused by a displacement of a fused graft. However, New Orleans Public Service, Inc. contends that plaintiff failed to show that she was unable to become reemployed as a beautician after her condition had improved. Indeed, NOPSI points out that plaintiff had reapplied approximately two months before the trial date (March 14, 1979) for a job as a beautician at the Southeast Memorial Hospital. Defendant also calls to our attention a report from plaintiff's treating physician dated November 3, 1978, in which he states that on that date Hilda Faciane was completely free of pain down the left arm; that she continued to have some mild degree of limitation of motion of the neck; however, she had adjusted without much difficulty. In that report, the doctor further stated that plaintiff was happy with the obtained results, and he encouraged her to become more active. According to NOPSI, reemployment at the hospital as a beautician was within her physical capabilities, would result in the continued accrual of retirement benefits and would result in no loss of future income. We do not agree.
*1315 Dr. Amilcar Correa, a neurosurgeon, was plaintiff's treating physician and performed the disc removal and fusion operation, and the subsequent surgical decompression of the nerve to free the compressed nerve root after a bone graft collapse. He testified, in deposition, that plaintiff had a 30% residual disability of the body as a result of the accident; that, when she raised her arms above her head, the nerve roots would become stretched and irritated, causing pain; and that plaintiff was advised to avoid any heavy lifting or elevation of the arms above shoulder level. According to the doctor, Faciane cannot carry out any duties as a nurse's aid or any duties requiring heavy lifting of patients. He stated, finally, that plaintiff had reached "maximum improvement".
In connection with the question of plaintiff's possible reemployment, Lilly Jarrell stated that there were no job openings at the hospital for a beautician who had a 30% permanent disability of the body, who could not lift overhead with her arms or push or pull anything of greater weight than twenty pounds. This witness stated that such a person was just not capable of doing the work. She stated that while the hospital may be required to employ a person with a disability if a vacancy occurs, she does not feel that plaintiff is capable of doing the work. She added that when a vacancy occurs, persons working in the hospital have a preference for a job over persons who are outsiders, and plaintiff now is "an outsider."
Dr. Philip W. Jeffress, an economist, computed plaintiff's life expectancy at 26 years from the date of trial, and her work life expectancy at 10.2 years.[3] Based on an annual income of $9,300.00, computed at monthly earnings in the sum of $711.00 at the time of the accident, and taking into consideration a 5% discount from the date of trial to the end of the work-life expectancy, plaintiff's loss of income, according to the expert, would amount to $72,900.00.[4] With a 3% inflation factor included, the figure for loss of future earnings, according to the economist, amounts to $82,800.00.[5] From these figures the economist deducted anticipated minimum wage earnings from the date of trial to the end of plaintiff's work-life expectancy. These deducted earnings, using the same 5% discount, amount to $25,800.00 and, adjusted by a 3% inflation factor, amount to $26,700.00. Based on this method of computation, according to the expert, plaintiff's future loss of wages amounted to approximately $56,000.00. Figured on a 26-year life expectancy, if plaintiff had continued to work for a fifteen-year period, her pension benefits (discounted at 5% and necessarily without the inflation factor) would amount to $57,606.00.
Considering that the trial judge was confronted with the testimony outlined hereinabove, relating to the probability of plaintiff's inability to become employed at the hospital, as well as the testimony of the economist on future loss of retirement benefits, we cannot say that an award for diminished earning capacity and loss of retirement benefits in the sum of $50,000.00 constituted an abuse of the trial court's discretion.
*1316 The economist's error in basing his computations on age fifty-two for plaintiff rather than her correct age, fifty-four, was insignificant under the circumstances here and does not affect our conclusion.
PAST PAIN AND SUFFERING AND FUTURE PAIN AND SUFFERING
The total amount of this award is $150,000.00. Subsequent to the accident plaintiff was seen by Dr. Lucas A. Di Leo and, after treatment for approximately six weeks, she was referred to Doctor Correa. He saw plaintiff on August 2, 1977. On this first visit she complained of neck and shoulder pain which had developed a few days after the accident. She had been treated by Dr. Di Leo with muscle relaxants and pain medications without improvement. According to Dr. Correa, plaintiff had mild arthritic changes of the spine and surgical region superimposed by the injury from the automobile accident. This caused either a cervical strain or some pre-existing degenerative changes to become symptomatic. The doctor was of the opinion that the automobile accident was the contributing or causing factor of plaintiff's problem.
Plaintiff was hospitalized in Methodist Hospital on August 8, 1977 where conservative treatment with muscle relaxants, physical therapy and pain medication was administered. No improvement was exhibited. A discogram showed degeneration and abnormality at the C5, C6 disc. During hospitalization, Faciane complained "bitterly" of pain and on August 23, 1977 underwent a cervical discectomy at C5-6 and C6-7. Fusion at both levels was performed. She was discharged on September 2, 1977. However, within 30 days Mrs. Faciane developed neck discomfort and bilateral arm pain. Post-operative x-rays showed that the bone graft had partially collapsed and become displaced.
On a September 30, 1977 visit to Dr. Correa, plaintiff complained of pain in the neck and down both arms. A collar was recommended and muscle relaxant and pain medication prescribed. Complaints of pain persisted and plaintiff was again hospitalized on October 21, 1977 at Methodist Hospital. Physical therapy was employed, a rigid neck brace was used, and pain relievers and sedatives were prescribed. Because of plaintiff's depressed state, she was seen by a psychiatrist at the hospital. On October 27, 1977 the psychiatric evaluation by Dr. Roger Anastasio was "adjustment reaction of adulthood with features of depression." On November 7, 1977 she was discharged.
The neck brace plaintiff used during her second hospital visit was the second brace recommended and apparently afforded some relief from pain. However, an examination of March 10, 1978 indicated continued neck and arm pain. Plaintiff was advised to continue use of the brace. She was seen again on June 2, 1978. From x-rays taken at that time and plaintiff's continued complaints of pain, Dr. Alain Cracco (an orthopedist who had been called in on consultation by Dr. Correa) and Dr. Correa were of the impression there existed a decompression of the nerve root which apparently became depressed by the collapse of the bone after the first surgery.
On September 5, 1978 plaintiff was admitted to Chalmette General Hospital where she underwent surgery to decompress or free the nerve root inbetween C3-4, C4-5, and C5-6 on the left. She was discharged from the hospital on September 21, 1978. On November 3, 1978 Mrs. Faciane was seen as an outpatient and at that time appeared to be free of arm pain. She was advised to avoid heavy lifting and elevation of the arm over the shoulder level. However, she again complained of pain on February 6, 1979. Dr. Correa was of the opinion that plaintiff had sustained a 30% disability of the body and had reached "maximum improvement." He was unable to determine how long the disability would exist.
It was Dr. Correa's opinion that a causal relationship existed between the accident, the injury and plaintiff's disability. It was Dr. Alain Cracco's opinion also that the degeneration of the cervical spine was aggravated by the accident and injury. Dr. Cracco's testimony of plaintiff's pain, treatment *1317 and hospitalization substantially corroborates and supports the testimony of Dr. Correa.
Plaintiff testified that she commenced to suffer neck and shoulder pain shortly after the accident that gradually became worse. She gave a history of continued pain from the date of the accident to the date of trial, March 14, 1979, a period of approximately two years.
In view of the prolonged and sometimes bitter pain suffered by plaintiff, accompanied by three periods of hospitalization requiring two operations and the use of neck braces and collars during this time, we conclude the $150,000.00 award for past and future pain and suffering was neither excessive nor inadequate.
Having so concluded, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Southeastern also appealed the judgment. On the day of argument before this court, however, Southeastern filed a written motion requesting its appeal be dismissed with prejudice. We granted that motion, and therefore will pretermit discussion of Southeastern's liability.
[2] In addition to the driver and to plaintiff, Robert Jacobs, plaintiff's divorced husband and Carleen Jacobs' father, was sitting in the rear seat.
[3] This computation is based on plaintiff's age at 52 years on the date of the accident on April 7, 1977. In fact, plaintiff was 54 years on that date.
[4] According to the income tax returns, plaintiff's 1976 earnings were $5,827. Her 1975 earnings were $6,088. According to plaintiff, her earnings were reduced because of extended illness resulting from hepatitis infection.
[5] Use of 5% discount and 3% inflation factors is not inconsistent with recent jurisprudence. See Roundtree v. Technical Welding & Fabrication Co., 364 So.2d 1325 (La.App. 4th Cir. 1978), writ refused, La., 367 So.2d 389 (6% discount, 3½% inflation); Robinson v. Graves, 332 So.2d 303 (La.App. 4th Cir. 1976), reversed on other grounds, La., 343 So.2d 147 (6% discount, 3% inflation); Morgan v. Liberty Mutual Ins. Co., 323 So.2d 855 (La.App. 4th Cir. 1975), application dismissed, La., 325 So.2d 282 (4.8% discount, 3.8% inflation); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978) (61/8% discount, 3% productivity increase, no allowance for inflation); Johnson v. International Ins. Co., 347 So.2d 1279 (La.App. 1st Cir. 1977), writ denied, La., 350 So.2d 1225 (6% discount, 4% inflation, 3% productivity increase.)